UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BERT VLADIMIR, Individually and On Behalf Of All Others Similarly Situated, | Index No.: 07-CIV-6416 |
| Plaintiffs, | |
| v. | **SUPPLEMENTAL AMENDED CLASS ACTION COMPLAINT** |
| BIOENVISION INC., CHRISTOPHER B. WOOD, JOSEPH P. COOPER, STEVEN A. ELMS, MICHAEL G. KAUFFMAN, ANDREW SCHIFF, JAMES S. SCIBETTA, and PERSEUS-SOROS BIOPHARMACEUTICAL FUND, LP, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Lead Plaintiffs, Bert Vladimir and Gary Thesling, by their undersigned attorneys, and plaintiff Donald Johnson, for their amended complaint (the "Complaint"), allege upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation made by and through their attorneys, which investigation included, among other things, a review of public documents filed with the Securities and Exchange Commission (the "SEC"), published reports, and news articles concerning Bioenvision Inc. ("Bioenvision" or the "Company"), and a verified complaint filed by a former executive officer of the Company described herein, as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Securities Exchange Act of 1934 (the "(Exchange Act)", 15 U.S.C. §78aa. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

2.      Venue is proper in this District pursuant to Section 27 of the Exchange Act because many of the alleged acts and transactions, and much of the conduct constituting violations of law, occurred, at least in part, in this District.  At all relevant times, Bioenvision's headquarters was located within this District.

3.      In connection with the acts alleged in this Complaint, defendants directly and indirectly, used the means and instrumentalities of interstate commerce, including the mails, telephone communications, and the facilities of the national securities exchanges.

## THE PARTIES

### Plaintiffs

4.      Lead Plaintiff Bert Vladimir engaged in the transactions in Bioenvision securities described in certifications filed with this Court and suffered loss and damage as a result of the violations of law described in this Complaint.

5.      Lead Plaintiff Gary Thesling engaged in the transactions in Bioenvision securities described in certifications filed with this Court and suffered loss and damage as a result of the violations of law described in this Complaint.

6.      Vladimir and Thesling have been appointed co-lead Plaintiffs in this action by the Court.

7.      Plaintiff Donald Johnson engaged in the transactions in Bioenvision securities described in a certification filed with this Court and suffered loss and damage as a result of the violations of law described in this Complaint.

### Defendants

8.      Defendant Bioenvision, prior to its October 23, 2007 merger (the "Merger") with Genzyme Corporation ("Genzyme"), was a Delaware biopharmaceutical company, with its

principal place of business located at 345 Park Avenue, New York, NY 10154. Defendant

Bioenvision is named herein because it is the issuer of the statements alleged to be materially

false and misleading described herein.

9.      Defendant Perseus-Soros Biopharmaceutical Fund, LP ("Perseus-Soros"), was

until the Merger, the single largest common stockholder of Bioenvision (owning approximately

20% of Bioenvision equity as of January 2007) and the sole holder of all of the preferred stock

issued by Bioenvision, which preferred stock confers certain special rights and benefits

including, without limitation, the right: (a) to receive an annual 5% dividend, cumulative in

arrears; (b) to increase or decrease the size of the Board; and (c) to vote separately (from the

common stockholders) as a class, on any material financing, acquisition or disposition of, or by,

Bioenvision. According to Bioenvision's former General Counsel And Chief Financial Officer,

David P. Luci, Defendant Perseus-Soros, "exercised a position of control over Bioenvision's

Board of Directors and Bioenvision" See, Verified Complaint, Luci v. Bioenvision, Inc., et al.,

Index No. 111478- 07, New York County Supreme Court , Commercial Division, ("Luci

Verified Complaint") at paragraph 16. Luci was an Executive Vice President of the Company

during the entire Class Period. Prior to and during the Class Period, Perseus-Soros was in a

position to and did exercise control over Bioenvision's Board of Directors (the "Board") and the

Company itself. During the Class Period, Perseus-Soros failed to file with the SEC amendments

to its December 21, 2004 Schedule 13D/A in violation of applicable law and thereby mislead

investors, plaintiffs and the class members regarding material events in connection with

Bioenvision. Perseus-Soros was at all relevant times during the Class Period an "insider" of the

Company and was under a duty to disclose all material non-public information in its possession

concerning the Company or else abstain from trading on the Company's securities. Perseus-Soros was at all time relevant to the complaint a controlling person of the Company.

10.    Defendant Christopher B. Wood ("Wood"), at all times relevant hereto, served as Chairman of Bioenvision's Board and Chief Executive Officer of the Company. In such capacity, Wood issued public statements on behalf of the Company as set forth herein and signed filings with the SEC made on behalf of the Company which were materially false and misleading.

11.    Defendant Joseph P. Cooper ("Cooper"), at all times relevant hereto, served as a director of Bioenvision. Defendant Cooper also serves as the executive vice president of Medicis Pharmaceutical Corp. ("Medicis"), which has had extensive business dealings with Perseus-Soros and/or its senior management. Upon information and belief, Cooper was recommended to become a member of the Board in 2006 by Perseus-Soros.

12.    Defendant Steven A. Elms ("Elms"), at all times relevant hereto, served as a director of Bioenvision. Elms also serves as a managing director of Perseus-Soros Management, LLC ("Perseus-Soros Management"), an affiliate of Perseus-Soros.

13.    Defendant Michael G. Kauffman ("Kauffman"), at all times relevant hereto, served as a director of Bioenvision. Kauffman is the president and chief executive officer of Predix Pharmaceuticals ("Predix"), in which Perseus-Soros has had a significant investment. Upon information and belief, Kauffman was recommended to become a member of the Board in 2004 by Perseus-Soros.

14.    Defendant Andrew Schiff ("Schiff"), at all times relevant hereto, served as a director of Bioenvision. Schiff, like Defendant Elms, also serves as a managing director of Perseus-Soros Management.

15.    Defendants Elms, Kauffman and Schiff were at all times relevant to the Complaint controlling persons of the Company.

16.    Defendant James S. Scibetta ("Scibetta"), at all times relevant hereto, served as the Chief Financial Officer of Bioenvision. In such capacity, Scibetta issued public statements on behalf of the Company as set forth herein and signed filings with the SEC made on behalf of the Company which were materially false and misleading.

17.    Defendants named in paragraphs 10 through 16 above are hereinafter referred to as the "Individual Defendants."

## CLASS ACTION ALLEGATIONS

18.    Plaintiffs bring this action as a class action, pursuant to Federal Rule of Civil Procedure 23. The Class consists of all persons and entities damaged as a result of their sales of Bioenvision securities during the period from April 11, 2007 through the close of trading on May 28, 2007. The following are excluded from the Class: (a) defendants; (b) the officers and directors of (i) Bioenvision, (ii) Genzyme and (iii) Perseus-Soros; (c) members of those persons' immediate families; those persons' legal representatives, heirs, successors and assigns, and (d) any entity in which any defendant has, or had, a controlling interest.

19.    This action is properly maintainable as a class action.

20.    The Class is so numerous that joinder of all members is impracticable. During the Class Period, hundreds of thousands of shares of Bioenvision common stock were sold. As of May 25, 2007, Bioenvision had approximately 55,035,739 outstanding shares of common stock. The record holders of the Company's securities can be easily determined from the stock transfer journals maintained by Bioenvision or its agents.

21.    Plaintiffs' claims are typical of the claims of the Class members as all members of the Class sold Bioenvision common stock during the Class Period in the open market and sustained damages as a result of the same misconduct, as alleged herein.

22.    Plaintiffs will fairly and adequately protect the interests of the Class members. Plaintiffs have suffered substantial economic losses as a result of defendants' misconduct, as alleged herein, and have a significant incentive to prosecute this action diligently. Plaintiffs are committed to prosecuting this action, and have retained competent counsel experienced in class action and securities litigation. Plaintiffs do not have interests antagonistic to or in conflict with those they seek to represent. Plaintiffs, therefore, are adequate Class representatives.

23.    A class action is superior to other methods for the fair and efficient adjudication of the claims herein asserted. The likelihood of individual Class members prosecuting separate individual actions is remote due to the relatively small loss suffered by each Class member as compared to the burden and expense of prosecuting litigation of this nature and magnitude. Absent a class action, defendants are likely to avoid liability for their wrongdoing, and Class members are unlikely to obtain redress for their wrongs alleged herein. There are no difficulties likely to be encountered in the management of the Class claims. This Court is an appropriate forum for this dispute.

24.    There is a well-defined community of interest in the questions of law and fact involved, affecting the members of the Class. Among the questions of law and fact common to the Class, which predominate over questions affecting any individual class member are, *inter alia*, the following:

a)    whether defendants violated Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5;

b)      whether defendants participated in the common course of conduct complained of herein;

c)      whether defendants misrepresented and/or omitted material facts during the Class Period;

d)      whether defendants acted with knowledge or reckless disregard for the truth in omitting and/or misrepresenting material facts concerning the Company;

e)      whether during the Class Period, the market prices of Bioenvision securities were artificially depressed due to the non-disclosures and/or material misrepresentations complained of herein; and

f)      whether the members of the Class have sustained damages, and, if so, the proper measure thereof.

## SUBSTANTIVE ALLEGATIONS

### Background

25.      Prior and during the Class Period, Bioenvision touted the focus of its business as the acquisition, development, distribution and marketing of compounds and technologies for the treatment of cancer, autoimmune disease and infection. While Bioenvision developed a variety of biopharmaceutical products and technologies, including Modrenal®, for the treatment of post-menopausal advanced breast cancer; OLIGON® technology, an advanced biomaterial that has been incorporated into various medical devices; and Suvus®, an antimicrobial agent for refractory chronic hepatitis C infection; the Company's flagship product was Clofarabine, a drug for the treatment of pediatric leukemia, that Bioenvision co-developed with Genzyme in Europe under the brand name Evoltra® ("Evoltra").

26.     During 2005 and 2006, according to SEC filings by Bioenvision, representatives of Genzyme and Bioenvision met from time to time to discuss licensing opportunities for Chlorafarabine and to explore the possibility that Genzyme would acquire Bioenvision outright.

27.     In August 2006, according to Bioenvision's SEC filings, Genzyme engaged Banc of America Securities LLC ("BOA") to replace the investment adviser it had consulted in connection with prior discussions concerning the acquisition of Bioenvision.

28.     According to Bioenvision's SEC filings, in January 2007, Earl M. Collier, an executive vice president of Genzyme, met with Dennis Purcell, a Senior Managing Director of Aisling Capital, an investment manager for Perseus-Soros. According to Bioenvision's SEC filings, Mr. Collier discussed with Mr. Purcell Genzyme's possible interest in acquiring the Company. Mr. Purcell communicated to Mr. Collier that it may be an appropriate time to discuss an acquisition of the Company and that Genzyme should take the matter up directly with the Company. According to the Luci Verified Complaint, Luci has been informed that "beginning in January 2007, Genzyme and Perseus-Soros secretly agreed upon a course of action pursuant to which Genzyme would make a tender offer to acquire all of the outstanding Bioenvision stock owned by Perseus-Soros and the public shareholders (including management of Bioenvision) and then merge Bioenvision into a wholly owned subsidiary of Genzyme created for such purpose." Luci Verified Complaint at paragraph 18.

29.     According to the Luci Verified Complaint, after the January meeting referred to above, the representatives of Perseus–Soros on the Bioenvision Board (Elms, Schiff, Cooper and Kaufman) "determined to accept an offer from Genzyme to acquire Bioenvision." Luci Verified Complaint paragraph 45.

30.    On February 8, 2007, defendants caused Bioenvision to issue a press release ("February 8, 2007 press release"), wherein it was represented that:

> New York, NY (February 8, 2007) – Bioenvision, Inc. (NasdaqGM:BIVN) today announced financial results for the second quarter ended December 31, 2006.
>
> Results and recent events include:
>
>> Bioenvision marks record quarterly revenue of $4.5 million as Evoltra® (clofarabine) sales doubled from the first quarter of 2007
>>
>> Bioenvision files with the EMEA for label extension of Evoltra® in elderly AML
>>
>> ASH conference spotlights pivotal filing data from study BIOV-121
>>
>> Bioenvision appoints new Chief Financial Officer
>>
>> Bioenvision appoints General Manager for Bioenvision JapanCo.
>>
>> Bioenvision out-licenses worldwide rights to its Oligon® technology
>
> "We are very pleased with the impact our sales and marketing organization has had since the formal launch of Evoltra® in September," said Christopher B. Wood, M.D., Bioenvision's Chairman and Chief Executive Officer. "The revenue growth in the pediatric indication, our filing for a label extension into adult Acute Myeloid Leukemia (AML) and our progress towards bringing Evoltra into Japan are significant achievements for Bioenvision, and we remain focused on continuing to execute on our global development and commercialization strategy for Evoltra in the months ahead."

31.    The February 8, 2007 press release, excerpted *supra*, also reassured investors that Bioenvision "remain[ed] focused on continuing to execute on our global development and commercialization strategy for Evoltra in the months, ahead."

32.    The foregoing statements were materially false and misleading because it failed to disclose that Bioenvision and its controlling shareholder, defendant Perseus-Soros were involved in discussions and negotiations involving Genzyme's acquisition of Bioenvision.  By addressing the "focus" of business of the Company, and "recent events"(other than Perseus-Soros) had a duty to include all material information regarding Bioenvision's business activities and to fully and accurately describe any potential changes in Bioenvision's business, or capital structure or independence being considered by the Company.

33.    According to the Bioenvision's SEC filings, on March 6, 2007 BOA sent to Bioenvision Genzyme's request for key information.

34.    The parties became more deeply involved in discussions and negotiations concerning Bioenvision's acquisition by Genzyme throughout March, 2007:

(a)    On March 15, 2007 defendant Wood sent an email to BOA requesting that Genzyme submit a bid specifying a price at which Genzyme would be prepared to acquire Bioenvision.

(b)    According to the Luci Verified Complaint, on March 16, 2007, the Bioenvision Board met secretly without keeping or minutes of the meeting to discuss the anticipated offer from Genzyme. Luci Verified Complaint at paragraph 48).  The Perseus-Soros members of the Board also insisted that Bioenvision's management agree to sell their shares of Bioenvision's common stock to Genzyme.  Id.

(c)    According to Luci, defendant Wood believes that defendant Scibetta was in constant contact with defendants Elms, Schiff, Cooper and Kauffman during March 2007. Luci Verified Complaint at paragraph 48.

35.    On April 2, 2007, Bioenvision issued a press release, which listed Defendant

Scibetta as a contact, announcing that Bioenvision had priced its registered offering of 8 million

shares of common stock, at a price of $3.75 per share.  According to the press release, the shares

were offered under Bioenvision's effective shelf registration statement filed with the SEC (the

"registration statement").  The sale was effected through a prospectus and the prospectus

supplement issued on or about March 30, 2007, which was filed with the SEC and was readily

available to market professionals trading in Bioenvision.

36.    The Prospectus Supplement issued by Bioenvision stock assured investors they

should rely upon information contained therein:

> You should rely only on the information contained in, or
> incorporated by reference into, this prospectus supplement and the
> accompanying prospectus.

37.    The Supplemental Prospectus addressed material aspects of Bioenvision's

business without making any disclosure of the negotiations and discussions with Genzyme which

were in a very advanced stage at the time of the issuance of the Supplemental Prospectus:

> **Our company**
>
> We are a product-orientated biopharmaceutical company primarily
> focused upon the acquisition, development, and marketing of
> compounds and technologies for the treatment of cancer. Our
> product pipeline includes Evoltra® (clofarabine), Modrenal® (for
> which Bioenvision has obtained regulatory approval for marketing
> in the United Kingdom for the treatment of post-menopausal breast
> cancer following relapse to initial hormone therapy), and other
> products. We are also developing Suvus®, which is currently in
> clinical development for refractory chronic hepatitis C infection.
>
> **Recent developments**
>
> We anticipate that Evoltra® sales revenue in Europe during the
> three-month period ended March 31, 2007 will be in a range
> between $3.6 million and $3.8 million, which is consistent with, or
> slightly higher than, the level of our sales revenue for Evoltra® in

the three-month period ended December 31, 2006. The foregoing anticipated Evoltra® sales revenues are preliminary and thus the final sales revenues are subject to completion of the financial reporting for the period.

Pursuant to the terms of our co-development agreement with Genzyme, the successor-in-interest to ILEX Oncology, Inc. following the merger consummated between Genzyme and Ilex in December 2004, both parties are required to share promptly all information, including clinical data, generated under the co-development program and Genzyme is obligated to pay all of the U.S. and Canadian research and development costs and 50% of all approved ex-U.S. and Canada research and development costs (except for Japan and Southeast Asia and except for non-cancer indications). If additional resources are required above the agreed upon costs, we may elect to pay these additional costs and certain of these payments will be credited against future royalty payments to Genzyme at the rate of $1.50 for every $1.00 of additional expenditures. Under the co-development agreement with Genzyme, we receive royalties on Genzyme's annual net sales on a sliding scale based on the level of annual net sales. Similarly, we pay a royalty to Genzyme and SRI, the inventor of clofarabine, on our European annual net sales. Although we have not received payment from Genzyme for our development costs incurred since Genzyme's acquisition of Ilex, we are discussing these reimbursements with Genzyme in an ongoing dialogue and are actively working on developing a consensus with Genzyme management for a development plan and budget going forward.

*        *        *

*We have limited experience in developing products and may be unsuccessful in our efforts to develop and commercialize our products, including our application for E.U. approval in adult AML.*

To achieve profitable operations, we, alone or with others, must successfully develop, clinically test, market and sell our products. In particular, we have submitted a filing for approval in patients with adult AML with the EMEA, and we are susceptible to the risk that our recent EMEA filing submission, which we filed in January 2007 for the treatment of adult patients with AML, will not be approved or will not be approved on a timely basis in accordance with our expectations. No assurance can be given that management's development efforts and/or commercial expectations will be successful and accurate.

We are developing clofarabine in conjunction with Genzyme, our U.S. co-development partner since its acquisition of ILEX Oncology, which occurred on December 21, 2004. No assurance can be given that the operational and managerial relations with Genzyme will proceed favorably or that the timeline for development of clofarabine will not be elongated now that Genzyme has replaced ILEX as our U.S. cancer-indication marketing partner. No assurance can be given that we or Genzyme have the oncology experience required to work successfully with the applicable regulatory authorities to build upon the licensed indications for clofarabine.

***We depend on our co-development agreement with Genzyme and if it does not proceed favorably, we may incur delay in the commercial value realized from Evoltra® (clofarabine), which may delay our ability to generate significant revenues and cash flow from the sale of Evoltra®.***

We have a co-development agreement with Genzyme, and pursuant to that agreement, Genzyme and any third party to which Genzyme grants a sublicense or transfer its obligations, has primary responsibility for conducting clinical trials and administering regulatory compliance and approval matters in certain cancer indications in the U.S. and Canada.

If Genzyme fails to meet its obligations or fails to perform satisfactorily under the co-development agreement including its obligation to cooperate and share data with us and/or its ongoing obligations to fund 50% of our reasonable development costs to develop Evoltra® outside North America, we could lose valuable time and/or resources in further developing clofarabine and further commercializing the drug both in the U.S. and in Europe. We can not provide assurance that Genzyme will cooperate with us or that Genzyme will not fail to meet its obligations under the co-development agreement. In fact, Genzyme has consistently failed to reimburse us for 50% of the reasonably incurred costs to develop Evoltra® in Europe despite our ongoing efforts to collect such amounts due and owed to us. In addition, development of compounds to the stage of approval includes inherent risk at each stage of development that FDA, in its discretion, will mandate a requirement not foreseeable by us or by Genzyme. There would also be testing delays if, for example, our sources of drug supply could not produce enough Evoltra® to support the then ongoing clinical trials being conducted. If this were to occur, it could have a material adverse effect on our ability to develop and/or market

Evoltra®, obtain necessary regulatory approvals, and generate sales and cash flow from the sale of Evoltra®.

If delays in completion constitute a breach by Genzyme or there are certain other breaches or failures to perform satisfactorily under the co-development agreement by Genzyme, then, at our discretion, the primary responsibility for completion may revert to us, but there is no assurance that we would have the financial, managerial or technical resources to successfully complete such responsibilities or, if successfully completed, to complete such tasks in timely fashion.

### We have a limited operating history, which makes it difficult to evaluate our business and to predict our future operating results.

Since our inception in August of 1996, we have been primarily engaged in organizational activities, including developing a strategic operating plan, raising capital, entering into various collaborative agreements for the in-licensing and/or development of products and technologies, hiring personnel and developing and testing our products. We have not generated any substantial revenues to date and we are not profitable. Accordingly, we have a limited operating history upon which an evaluation of our performance and prospects can be made.

### The price of our common stock is likely to be volatile and subject to wide fluctuations.

The market price of the securities of biotechnology companies has been especially volatile. Thus, the market price of our common stock is likely to be subject to wide fluctuations. For the twelve month period ended December 31, 2006, our stock price has ranged from a high of $8.95 to a low of $4.08. If our revenues do not grow or grow more slowly than we anticipate, or, if operating or capital expenditures exceed our expectations and cannot be adjusted accordingly, or if some other event adversely affects us, the market price of our common stock could decline. In addition, if the market for pharmaceutical and biotechnology stocks or the stock market in general experiences a loss in investor confidence or otherwise fails, the market price of our common stock could fall for reasons unrelated to our business, results of operations and financial condition. The market price of our stock also might decline in reaction to events that affect other companies in our industry even if these events do not directly affect us. In the past, companies that have experienced volatility in the market price of their stock have been the subject of securities class action

litigation. If we were to become the subject of securities class action litigation, it could result in substantial costs and a diversion of management's attention and resources.

***The price of our common stock is likely to be volatile and subject to wide fluctuations.***

The market price of the securities of biotechnology companies has been especially volatile. Thus, the market price of our common stock is likely to be subject to wide fluctuations. For the twelve month period ended December 31, 2006, our stock price has ranged from a high of $8.95 to a low of $4.08. If our revenues do not grow or grow more slowly than we anticipate, or, if operating or capital expenditures exceed our expectations and cannot be adjusted accordingly, or if some other event adversely affects us, the market price of our common stock could decline. In addition, if the market for pharmaceutical and biotechnology stocks or the stock market in general experiences a loss in investor confidence or otherwise fails, the market price of our common stock could fall for reasons unrelated to our business, results of operations and financial condition. The market price of our stock also might decline in reaction to events that affect other companies in our industry even if these events do not directly affect us. In the past, companies that have experienced volatility in the market price of their stock have been the subject of securities class action litigation. If we were to become the subject of securities class action litigation, it could result in substantial costs and a diversion of management's attention and resources.

***Future sales or the possibility of future sales of substantial amounts of our common stock by stockholders or by our officers and directors may cause the price of our common stock to decline.***

Officers, directors and employees, and certain other stockholders hold significant numbers of shares of our common stock. Some of those shares are freely tradable without restriction under the federal securities laws, and those that are not may be sold in the future pursuant to newly filed effective registration statements, in compliance with the requirements of Rule 144 under the Securities Act. Sales in the public market of substantial amounts of our common stock, whether by our officers, directors, employees or others, or the perception that such sales could occur, could materially adversely affect prevailing market prices for our common stock and our ability to raise additional capital through the sale of equity securities.

***Anti-takeover laws, our shareholder rights plan, and provisions of our certificate of incorporation may discourage, delay, or prevent a merger or acquisition that our stockholders may consider favorable.***

Section 203 of the Delaware General Corporation Law contains provisions that may delay or prevent a third party from acquiring control of us, even if doing so might be beneficial to our stockholders by providing them an opportunity to sell their shares at a premium to the then current market price. In general, Section 203 prohibits designated types of business combinations, including mergers, for a period of three years between us and any third party who owns 15% or more of our common stock. This provision does not apply if:

• our board of directors approves the transaction before the third party acquires 15% of our common stock;

• the third party acquires at least 85% of our common stock at the time its ownership exceeds the 15% level; or

• our board of directors and two-thirds of the shares of our common stock not held by the third party vote in favor of the transaction.

We also adopted a shareholder rights plan on November 17, 2004 to deter hostile or coercive attempts to acquire us. Under the plan, if any person or group acquires more than 15% of our common stock without approval of the board of directors under specified circumstances, our other stockholders have the right to purchase shares of our common stock, or shares of the acquiring company, at a substantial discount to the public market price. This plan makes an acquisition much more costly to a potential acquirer, which may deter a potential acquisition.

Our certificate of incorporation also authorizes us to issue up to 20,000,000 shares of preferred stock in one or more different series with terms fixed by the board of directors. Stockholder approval is not necessary to issue preferred stock in this manner. Thus, our board of directors can authorize and issue shares of preferred stock with voting or conversion rights that could adversely affect the voting or other rights of holders of our common stock and thereby reduce its value. These rights could have the effect of making it more difficult for a person or group to acquire control of us, as well as prevent or frustrate any attempt by stockholders to change

- 16 -

our direction or management. While our board of directors has no current intention to issue any preferred stock, the issuance of these shares may deter potential acquirors.

***Certain events could result in a dilution of holders of our common stock.***

As of December 31, 2006, we had 42,982,740 shares of common stock outstanding, 2,250,000 shares of Series A Convertible Participating Preferred Stock outstanding which are currently convertible into 4,500,000 shares of common stock and common stock equivalents, and warrants and stock options, convertible or exercisable into 10,053,314 shares of our common stock. The exercise and conversion prices of the common stock equivalents range from $1.25 to $8.87 per share. We have also reserved for issuance an aggregate of 6,750,000 shares of common stock for a stock option plan for our employees. Historically, from time to time, we have awarded our common stock to our officers, in lieu of cash compensation, although we do not expect to do so in the future. As of December 31, 2006, we have the sale of shares of common stock underlying 6,750,000 options are registered under the Securities Act on Form S-8. The future resale of these shares underlying stock options will result in a dilution to your percentage ownership of our common stock and could adversely affect the market price of our common stock.

The terms of our cumulative Series A Convertible Participating Preferred Stock include antidilution protection upon the occurrence of sales of our common stock below certain prices, stock splits, redemptions, mergers and other similar transactions. If one or more of these events occurs the number of shares of our common stock that may be acquired upon conversion or exercise would increase. If converted or exercised, these securities will result in a dilution to the holder's percentage ownership of our common stock. The resale of many of the shares of common stock which underlie these options and warrants are registered under this prospectus and the sale of such shares may adversely affect the market price of our common stock.

38.    Nothing in the registration statement or the press release or Prospectus Supplement announcing the offering indicated that defendants were considering a sale, and/or merger with Genzyme.

39.     The Supplemental Prospectus was materially false and misleading because it failed to disclose that Bioenvision and its controlling shareholder, defendant Perseus-Soros were involved in discussions and negotiations involving Genzyme's acquisition of Bioenvision.  By addressing the business of the Company, recent developments, its relationships with Genzyme, the stock price and volatility and future ales and dilution and merger defendants (other than Perseus-Soros) had a duty to include all material information regarding Bioenvision's business activities and to fully and accurately describe any potential changes in Bioenvision's business, or capital structure or independence being considered by the Company.

40.     The market responded quickly to the report of Bioenvision's dilutive public offering of its stock at $3.75 per share. On April 4, 2007, the price of Bioenvision stock declined from its close at $4.09 on March 30, 2007 to $3.81.

### THE CLASS PERIOD BEGINS:  ON APRIL 11, 2007 GENZYME MAKES A FIRM ALL CASH OFFER FOR BIOENVISION STOCK IN RESPONSE TO BIOENVISION'S MARCH 15, 2007 INVITATION

41.     According to Bioenvision's SEC filings, in response to Wood's March 15, 2007 email to BOA inviting Genzyme to make an acquisition proposal at a price certain per share, on April 11, 2007 Genzyme sent an indication of interest to Bioenvision's Board indicating a potential acquisition price $5.25 per share of Bioenvision common stock.  Genzyme also requested access to additional information form Bioenvision for "confirmatory due diligence" according to Bioenvision's SEC filings.

42.     This event and the entire prior course of dealings with Genzyme was material and was required to be disclosed in order to make the statements previously issued by Bioenvision not materially misleading because all of the statements issued by Bioenvision described in this

Complaint were still "alive" and influencing the price of Bioenvision common stock in the marketplace.

43.     At the time of the agreement in January 2007 between Perseus-Soros and Genzyme for Genzyme to acquire Bioenvision referred to above, Perseus-Soros owned 20% of the outstanding common stock of the Company and was therefore, pursuant to Section 13(d) of the Exchange Act and Rule 13d-1, et. seq., required to file a Schedule 13D to describe any "Contracts, Arrangements, Understandings or Relationships With Respect to The Securities of the Issuer [Bioenvision]" under "Item 6" of the form suggested by SEC Rules.  Section 13(d) also required Perseus-Soros to update the information in its 13G in "Item 6" of the Schedule 13 D in the event of any material changes in any "contracts, arrangements, understandings or relationships" with respect to the Company.  Once Perseus-Soros and its representatives made the agreements understandings or relationships referred to herein with Genzyme in January 2007 with respect to acquisition of the Company's securities, Perseus- Soros was legally required to file an amended Schedule 13D and its  duty to do so continued throughout the Class Period.  At no time before the announcement of the Company's agreement to merge with Genzyme did Perseus-Soros ever amend its 13d filings or  ever correct the false and misleading Schedule 13D/A it filed on December 21, 2004 Schedule despite a clear and unequivocal duty to do so under the federal securities laws. Accordingly, as of late January 2007, Perseus-Soros was required to amend its December 21, 2004 Schedule 13 D/A and its failure to do so rendered that filing materially false and misleading and it continued to remain materially false and misleading during the entire class period.

44.     According to the definitive proxy statement filed with the SEC on September 7, 2007 (the "Proxy Statement"), Bioenvision Board held a series of special telephonic meetings on

April 12, 13, and 19, 2007, "to further discuss the Genzyme Offer, in which [Bioenvision]

management and representatives of UBS and Goodwin Procter LLP ("Goodwin Procter"), legal

counsel to [Bioenvision], participated."

45.    According to the Company's SEC filings, on April 20, 2007, representatives of

Bioenvision told BOA that the Company would provide Genzyme with a limited set of additional

confidential information "to help Genzyme verify that is $5.25 per share bid was appropriate"

46.    According to those same filings on April 24, 2007, Genzyme and the Company

entered into a new confidentiality agreement, "pursuant to which each party agreed to keep

confidential nonpublic information shared in the course of discussions and diligence review." *Id.*

47.    On April 30th 2007, the Company made additional due diligence materials

available to Genzyme including confidential information from regulators concerning approval

for clorafarabine for additional indications.

48.    Pursuant to the Proxy Statement, on May 1, 2007, Bioenvision Board created a

committee (the "Committee"), authorized to work with Bioenvision's senior management, UBS

Securities LLC (UBS) and Goodwin Procter LLP "Goodwin Procter", "to assist in facilitating

possible negotiations with Genzyme ....".

49.    On the same day, May 1, 2007, before the opening of trading, defendants caused

Bioenvision to issue a press release informing investors that Bioenvision would hold a live

webcast of its quarterly conference call at 10:00 EDT on May 8, 2007.  The press release

provided that:

> Senior management will discuss the Company's financial results as
> of March 31, 2007 and recent developments.  Bioenvision's
> primary focus is the acquisition, development and marketing of
> compounds and technologies for the treatment of cancer.
> Bioenvision has a broad pipeline of products for the treatment of
> cancer, including: Evoltra®, Modrenal® (for which Bioenvision

> has obtained regulatory approval for marketing in the United
> Kingdom for the treatment of post-menopausal breast cancer
> following relapse to initial hormonal therapy), and other products.
> Bioenvision is also developing Suvus® which is currently in
> clinical development for refractory chronic hepatitis C infection.

50.     This statement was materially false and misleading because it failed to disclose

that Bioenvision and its controlling shareholder, defendant Perseus-Soros were involved in

discussions and negotiations involving Genzyme's acquisition of Bioenvision.  By addressing the

"focus" of business of the Company, (other than Perseus-Soros) had a duty to include all material

information regarding Bioenvision's business activities and to fully and accurately describe any

potential changes in Bioenvision's business, or capital structure or independence than being

considered by the Company.

51.     On May 2, 2007, while under a duty to disclose material inside information in its

possession or to abstain from trading, defendant Perseus-Soros exercised its warrants to purchase

an aggregate of 3 million shares of Company common stock at a purchase price of $2.00 per

share.

52.     On May 7, 2007, defendants caused Bioenvision to issue a press release wherein

it was reported that:

> Bioenvision, Inc. (NASDAQ:BIVN) announced today that it has
> received an aggregate of $7.4 million as a result of the exercise by
> existing company investors of previously issued warrants.
>
> "We view the exercise of these warrants as a vote of confidence in
> the Company's execution capabilities and substantial future
> prospects.  The $7.4 million in proceeds from this transaction
> strengthens Bioenvision's balance sheet and provides additional
> liquidity that will support our strategy to build shareholder value
> through, among other things, our ongoing clinical development
> programs for Evoltra® (clofarabine)," said Christopher B. Wood,
> M.D., Bioenvision's chairman and chief executive officer.

53.    This statement was materially false and misleading because it failed to disclose that Bioenvision and its controlling shareholder, defendant Perseus-Soros were involved in discussions and negotiations involving Genzyme's acquisition of Bioenvision. Defendants had a duty to include all material information regarding Bioenvision's business activities and to fully and accurately describe any potential changes in Bioenvision's business, or capital structure or independence than being considered by the Company.

54.    On May 8, 2007, just weeks before the announcement of the Merger, defendants caused Bioenvision to issue a press release ("May 8, 2007 press release") that reported that Bioenvision's financial results for the third quarter ended March 31, 2007.

55.    The May 8, 2007 press release also provided that:

> New York, NY, May 8, 2007 – Bioenvision, Inc. (Nasdaq: BIVN) today announced financial results for the third quarter ended March 31, 2007. In the third quarter the company filed a marketing authorization application with the European Medicines Agency (EMEA) for a label extension for clofarabine in elderly patients with acute myeloid leukemia who are considered unsuitable for intensive chemotherapy. The filing has been validated by the Agency and the review process is underway.

> "The Company's number one priority is to expand the indications for use of Evoltra® (clofarabine) and to realize the full potential for this very active agent. The application for the label extension in Europe is an important part of our strategy for building Bioenvision as a strong commercial enterprise and broadening the market and revenue opportunity for the company," said Christopher B. Wood, M.D., Bioenvision's chairman and chief executive officer.

> James S. Scibetta, Bioenvision's chief financial officer, added, "In addition to the regulatory activities, we are also enhancing our corporate structure and strengthening our balance sheet. Our recent success raising capital with an over-subscribed book has yielded a solid balance sheet giving us the flexibility to continue building a commercial organization and positioning us well to continue to pursue clinical development and commercialization of clofarabine globally."

....

Dr. Wood concluded.," We look forward to continuing our progress around several key initiatives including: continued revenue growth in our approved pediatric acute lymphoblastic leukemia ("ALL") indication; moving forward toward adult AML regulatory approval, launch, and revenue growth across Europe; pediatric and adult AML submissions and approvals in Japan; and lastly clinical data for cloraforabine in myelodysplastic syndromes (MDS), chronic lymphocytic leukemia (CLL) and solid tumors form our partner Genzyme."

....

Bioenvision's primary focus is the acquisition, development and marketing of compounds and technologies for the treatment of cancer. Bioenvision has a broad pipeline of products for the treatment of cancer, including: Evoltra®, Modrenal® (for which Bioenvision has obtained regulatory approval for marketing in the United Kingdom for the treatment of post-menopausal breast cancer following relapse to initial hormonal therapy), and other products. Bioenvision is also developing Suvus® which is currently in clinical development for refractory chronic hepatitis C infection.

56.    The statements contained in the May 8, 2007 press release were materially false and misleading because defendants failed to disclose that Bioenvision, Perseus-Soros and Genzyme were in discussions, the goal of which was to arrange a merger of Bioenvision with Genzyme. Defendants were under a legal duty to make such disclosure because having issued statements on the subject of Bioenvision's financial objectives, defendants were under a duty to provide complete disclosure of all material information on these subjects. Such material information included, but was not limited to the fact that Bioenvision, Perseus-Soros and Genzyme had discussed the relative values of Bioenvision and Genzyme, the form of the combination of the two companies; the proposed leadership of the combined companies; and the price Genzyme would pay for Bioenvision's shares.

57.    On May 9, 2007 the Company participated in the UBS Global Generic and

Specialty pharmaceuticals conference in New York City and addressed investors and analysts but

failed to make any disclosures about its progress toward an acquisition of the Company by

Genzyme. The presentation on behalf of the Company by representatives of the Company was

materially false and misleading for the reasons previously set forth herein.

58.    On May 9, 2007 the Company released its Quarterly Report on Form 10-Q for the

quarterly period ended March 30, 2007. The report was signed by defendants Scibetta and

Wood. In Note 14 to its unaudited financial statements, the Company lists three post-March 30,

2007 events in a section titled "Subsequent Events" but failed to disclose any information

concerning its progress towards a deal with Genzyme for the acquisition of all the equity of the

Company. The omission of any mention of the discussions and negotiations between

Bioenvision and Genzyme concerning Genzyme's acquisition of Bioenvision rendered this

statement materially false and misleading for the reasons previously set forth here.

59.    In "Item 2" of the same report titled "Management's Discussion and Analysis of

Financial Condition and Results of Operations," ("MD&A") it was represented inter alia :

> (a)    We are a product –oriented pharmaceutical company
> primarily focused upon the acquisition, development and
> marketing of compounds and technologies for the treatment of
> cancer. Our product pipeline includes Evoltra®, Modrenal® (for
> which Bioenvision has obtained regulatory approval for marketing
> in the United Kingdom for the treatment of post-menopausal breast
> cancer following relapse to initial hormonal therapy), and other
> products. Bioenvision is also developing Suvus® which is
> currently in clinical development for refractory chronic hepatitis C
> infection.
>
> ....
> To date, the majority of our development activities and resulting R
> & D expenditures have related to the development of
> cloraforabine. Our primary business strategy has included taking
> cloraforabine to market in the E.U. and using the proceeds from

our resulting marketing efforts , in part, to expand the indications
for cloraforabine and to progress the other products and
technologies in our pipeline.

....

You should consider the likelihood of our future success to be
highly speculative in light of our limited operating history, as well
as the limited resources, problems, expenses, risks and
complications frequently encountered by similarly situated
companies.

(b)    Liquidity And Capital Resources

[W]e may need additional financing to fund the research and
development and marketing programs for our products and to
generally expand and grow our business. Because we will be
required to fund additional operating losses in the foreseeable
future, our financial position will continue to deteriorate. We
cannot be sure that we will be able to find financing in the in the
future or, if found, such funding may not be on the terms favorable
to us.  If adequate financing is not available, we may be required to
delay scale back or eliminate some of our research and
development programs, to relinquish rights to certain technologies
or products, or to license third parties to commercialize
technologies or products that we would otherwise seek to develop.
Any inability to obtain additional financing, if required, would
have a material adverse effect on our ability to continue our
operations and implement our business plan.

(c)    Risks Factors

We are developing cloraforabine in conjunction with Genzyme,
our U.S. co-development partner since its acquisition of ILEX
Oncology, which occurred on December 21, 2004. No assurance
can be given that the operational and managerial relations with
Genzyme will proceed favorably or that the timeline for
development of cloraforabine will not be elongated now that
Genzyme ahs replaced ILEX as our U.S. cancer –indication
marketing partner. No assurance can be given that we o r Genzyme
have the oncology experience required to work successfully with
the applicable regulatory authorities to build upon the licensed
indications for cloraforabuine.

60.    In the "Subsequent Events" section of the 10Q, Defendants failed to make any disclosure concerning its progress towards a deal with Genzyme to acquire all of the equity of the Company. The omissions of such information rendered the statements in the MD&A referred to above section materially false and misleading for the reasons previously alleged herein.

61.    On May 10, 2007 Genzyme through BOA reiterated its $5.25 offer to the Company and on May 15, 2007 the Company's management expressed to BOA an agreement to move forward with advanced due diligence and provided additional information to Genzyme to allow it to complete its due diligence process.

62.    On May 23, 2007, as news of the Merger began to leak into the market, the artificial suppression of Bioenvision stock price moderated, and the stock price rose from a close of $4.22 of May 22, 2007.

63.    On May 24, 2007, Genzyme's Board of directors approved the transaction. On the same day the Company announced an amendment to an important research h license and requested that Genzyme consider whether the new agreement warranted a higher price of the Company.

64.    On May 25, 2007, the parties agreed to proceed with an acquisition at $5.60 per share of Bioenvision common stock. The revised price was approved by a special committee of Company directors on May 25, 2007. and on May 28 a final merger agreement was approved.. The agreement was signed on May 29, 2007.

65.    After the announcement of the merger the price of the Company's common stock closed at $5.63 on May 29, 2007, as the market absorbed Bioenvision's announcement that it

had entered into a definitive merger agreement with Genzyme, according to which, Genzyme would obtain exclusive rights to clofarabine.

66.    Pursuant to the terms of the Merger, announced on May 29, 2007, Bioenvision agreed to be acquired by Genzyme for $5.60 per share of Bioenvision's outstanding shares of common stock in a deal valued at approximately $345 million.

67.    On the first trading day following the announcement of the Merger, the price of Bioenvision stock climbed sharply, on significantly higher volume than the volume of preceding trading days or the average trading volume.  On May 30, 2007, the price of Bioenvision stock continued to rise to a high of $5.88 per share as investors absorbed the previously undisclosed news of the Merger.

68.    By the time of the announcement, Bioenvision's Board had unanimously approved the Merger and recommended to Bioenvision's shareholders that they tender their shares into the tender offer and in addition, certain officers, directors and/or shareholders of Bioenvision entered into Tender and Voting Agreements in support of the Merger.  According to Bioenvision's Form 8-K, filed with the SEC on May 29, 2007, these individuals and/or entities consist of (i) all of Bioenvision's Directors, including Defendant Wood; (ii) certain executive officers of Bioenvision, including  David P. Luci (Executive Vice President, General Counsel and Secretary), Kristen M. Dunker (Vice President, Corporate Compliance and Associate General Counsel), Robert Sterling (Vice President, Business Development), Ian Abercombie (Program Director, Europe), and Hugh S. Griffith (Chief Operating Officer); and (iii) Defendant Perseus-Soros, for which, as stated *supra*, Defendants Elms and Schiff serve as managing directors.

69.     By the time of the announcement of the agreement and plan of the Merger, Bioenvision and defendants had known that such a transaction had been planned and negotiated for since at least January 2007. The defendants named herein had participated in the discussions and negotiations. Thus, defendants were under a duty to correct the statements made prior to May 1, 2007, described herein, which were still "alive" and influencing the price of Bioenvision stock in the market, and were under a further duty to make all their statements and announcements on and after April 11, 2007, truthful, complete and accurate, and to ensure that all statements contained all material facts necessary in order to make statements not materially misleading.

70.     Instead, defendants intentionally failed to update or correct previous statements regarding the Company's business plans and "primary focus" and continually misrepresented the fact that "its primary focus" was no longer to develop and market cancer treatments, but rather to find a merger partner and to effectuate a takeover of the Company.

71.     During the Class Period, defendants' material omissions and misrepresentations had the effect of artificially deflating the price of Bioenvision's securities and/or maintaining the price of Bioenvision's securities at levels at which those securities would not have traded had the truth concerning the Company been timely disclosed to investors. This conduct by defendants resulted in plaintiffs and the other Class members' sale of their Bioenvision securities at prices significantly below the actual value of those securities.

72.     As Defendant Wood acknowledged in the Company's May 29, 2007 press release, announcing the Merger, the acquisition price represented approximately a 50% premium to the last 20-trading-day average of Bioenvision common stock.

73.    Plaintiffs and the other Class members either would not have sold Bioenvision securities or would not have sold such securities at the prices that prevailed during the Class Period, had defendants properly and timely disclosed the material information about the Company's plan to engage in a merger transaction with Genzyme.

74.    The material omissions, misrepresentations, acts, practices and schemes alleged herein were the direct and proximate cause of the damages and loss sustained by plaintiffs and the other Class members in connection with their sales of the Company's securities during the Class Period.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

75.    At all relevant times, the market for Bioenvision's securities was an efficient market for the following reasons, among others:

a)    Prior to the Merger, Bioenvision common stock was listed and actively traded on the Nasdaq Stock Market LLC, a highly efficient market;

b)    As a regulated issuer, the Company filed periodic public reports with the SEC;

c)    Prior to and during the Class Period, Bioenvision securities were followed by analysts employed by major brokerage firms that wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace; and

d)    Prior to and during the Class Period, Bioenvision regularly issued press releases that were carried by national news wires.  Each of these releases was publicly available and entered the public marketplace.

76.    As a result, the market for Bioenvision's securities promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the Company's stock price. Under these circumstances, all purchasers of Bioenvision's securities during the Class Period suffered similar damages through their purchases of said securities at artificially inflated prices and accordingly, the presumption of reliance applies.

## NO SAFE HARBOR

77.    The statutory safe harbor provided for certain forward-looking statements under certain circumstances does not apply to any of the allegedly false statements plead in this Complaint. The specific statements plead herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important that could cause actual corporate results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements plead herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

## SCIENTER ALLEGATIONS

78.    As alleged herein, defendants acted with *scienter* in that they knew that the public documents and statements, issued or disseminated by or in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or

documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws. Defendants' knowledge was acquired through their direct participation in the discussions and negotiations and alleged herein.

79.    As set forth elsewhere herein, in detail, defendants, by virtue of their participation in the events described herein were in possession of information reflecting the true facts regarding the Company's strategic objectives and future business prospects, and defendants' control over and/or issuance of the Company's materially misleading statements, and/or their associations with the Company, which made them privy to confidential proprietary information concerning Bioenvision, were active and culpable participants in the fraudulent scheme described herein.

80.    At all relevant times, all defendants were in possession of material information which contradicted their own public statements and the public statements issued on behalf of and in the name of Bioenvision.

81.    Defendant Perseus-Soros and its representations on Bioenvision's Board had a unique financial motive to conceal and misrepresent information regarding a merger between Bioenvision and Genzyme in that Genzyme was the only prospective buyer for Bioenvision because of its marketing co-venture with Bioenvision. In order to facilitate a deal between the two companies which would allow Perseus-Soros to profitably monetize its large illiquid stake in Bioenvision, Perseus-Soros and its representations on Bioenvision's Board participated in the violations enumerated herein.

82.    Defendants knew and/or recklessly disregarded the false and misleading nature of the information, which they caused to be disseminated to the investing public. The ongoing

fraudulent scheme described in this Complaint could not have been perpetuated over a substantial period of time, as has occurred, without the knowledge and complicity of the defendants who constituted Bioenvision's key personnel at the highest level of the Company, as well as the Company's controlling stockholder, Defendant Perseus-Soros.

83.    Defendants engaged in such scheme to purposefully deflate the price of Bioenvision securities in order to, among other things, ensure that Genyzme could quickly acquire Bioenvision for cash.

84.    Defendants Wood and Scibetta participated in the scheme because of their motive to keep their positions through the time of the merger in order to be eligible for change of control bonus. As stated in the Luci Verified Complaint, the controlling shareholders of Bioenvision threatened to terminate key officers of Bioenvision in advance of the merger to save Bioenvision and Genzyme from paying bonuses triggered by the merger.

## LOSS CAUSATION

85.    During the Class Period as detailed herein, defendants participated in a scheme to deceive the market and a pattern of conduct that artificially deflated the price of Bioenvision's securities and operated as a fraud or deceit on the shareholders of Bioenvision stock who sold the said securities during the Class Period, by failing to disclose the true facts concerning the Company's plan to effect a change in corporate control and enter into a merger transaction with Genzyme.

86.    As set forth above, when defendants' omissions and misrepresentations made prior to May 29, 2007, were revealed to the market, the price of Bioenvision's securities promptly went up, as the prior artificial deflation was reversed. As a result of their sales of

Bioenvision's securities during the Class Period, plaintiffs and the other Class members thus

suffered economic loss (damages within the meaning of federal securities laws.)

87.    As a direct and proximate result of the false and misleading statements and

incomplete or partial disclosures made by defendants prior to May 29, 2007, the day when the

Merger was announced, the prices of Bioenvision's securities fell precipitously during the Class

Period, as detailed herein.   The size and timing of these stock price declines defeats any

inference that the losses sustained by plaintiffs and the other Class members were the result of

market conditions, macroeconomic or industry factors, or developments specific to the

Company, unrelated to defendants' improper conduct.

## COUNT I

### For Violations of §10(b) of the Exchange Act
### (Against all Defendants except Perseus-Soros)

88.    Plaintiffs repeat and reallege each and every allegation contained in each of the

foregoing paragraphs as if set forth fully herein.

89.    During the Class Period, each of the defendants named in this Count, individually,

and in concert with the other defendants, engaged in a plan, scheme and course of conduct,

pursuant to which they knowingly and/or recklessly engaged in acts, transactions, practices and

courses of business, which operated, as fraud upon plaintiffs and other members of the Class.

90.    Defendants named in this Count perpetrated this fraudulent scheme by making the

false and misleading statements described in the Complaint and by failing to disclose the plan to

sell Bioenvision to Genzyme.

91.    Defendants named in this Count had actual knowledge about the Company's plan

to merge with Genzyme and that the omissions and statements specifically alleged above were

materially false and misleading.   In the alternative, defendants named in this Count acted with

reckless disregard for the truth in that they failed or refused to disclose information about the Company's merger negotiations with Genzyme and the plan to merge with Genzyme. Defendants named in this Count had a financial motive to conceal and misrepresent material information as set forth herein in order to facilitate a merger with Genzyme to facilitate the sale of the company as soon as possible.

92.    As a direct and proximate result of the foregoing material omissions and misrepresentations and the fraudulent scheme in which defendants named in this Count participated, the market prices of Bioenvision securities were artificially suppressed throughout the Class Period.

93.    In ignorance of the materially misleading and/or incomplete nature of the Class Period representations made by defendants named in this Count and those defendants' participation in the fraudulent scheme alleged herein, plaintiffs and the other Class members relied to their detriment upon the accuracy and completeness of those defendants' statements and/or upon the integrity and efficiency of the market for Bioenvision securities.

94.    Plaintiffs and the other Class Members would not have sold Bioenvision securities at the market prices that prevailed during the Class Period (thereby incurring significant damages), if at all, had defendants named in this Count disclosed information about the Company's business and plans.

95.    The market price of Bioenvision securities increased significantly as investors belatedly learned the facts that had been concealed by defendants during the Class Period. Plaintiffs and the other Class members, therefore, have suffered substantial damages as a direct and proximate result of the misconduct committed by defendants named in this Count.

96.     By reason of the foregoing, defendants named in this Count knowingly or recklessly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes and artifices to defraud; (b) made material omissions and/or misrepresentations of fact and failed to disclose material facts necessary in order to make their statements, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and courses of business that operated as fraud or deceit upon plaintiffs and other members of the Class in connection with their sales of Bioenvision securities during the Class Period.

## COUNT II

### (Violations Of §10(B) Of The Exchange Act Against Defendant Perseus -Soros)

97.     Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

98.     During the Class Period, Perseus-Soros and each of the other defendants, individually, and in concert with the other defendants, engaged in a plan, scheme and course of conduct, pursuant to which they knowingly and/or recklessly engaged in acts, transactions, practices and courses of business, which operated, as a fraud upon plaintiffs and other members of the Class.  The scienter of Perseus-Soros is evidenced by its conscious knowledge of the SEC rules and regulations concerning 13d filings and their contents and the participation of Perseus-Soros and it representatives in merger discussions and Perseus-Soros' financial interest in having Bioenvision acquired for cash as quickly as possible.

99.     Defendant Perseus-Soros was part of the scheme to conceal and misrepresent   its discussions with Bioenvision and the plan to sell its equity to Genzyme.  Under SEC regulations, Perseus-Soros was required to file an amendment to its December 21, 2004 Schedule 13D as previously set forth.

100.    Perseus-Soros failed to do so and violated SEC regulations by its failure.

101.   Perseus-Soros' knowing failure to amend its Schedule 13d constitutes a violation of Section 10b and Rule 10b-5 thereunder.

102.   As a direct and proximate result of the foregoing material omissions and misrepresentations and the fraudulent scheme in which defendant participated, the market prices of Bioenvision's securities were artificially suppressed throughout the Class Period.

103.   In ignorance of the materially misleading and/or incomplete nature of the Class Period representations made by defendants and defendants' participation in the fraudulent scheme alleged herein, Plaintiffs and other members of the Class relied to their detriment upon the accuracy and completeness of defendants' statements and/or upon the integrity and efficiency of the market for the Company's securities.

104.   Plaintiffs and the other members of the Class would not have sold Bioenvision's securities at the market prices that prevailed during the Class Period, if at all, had defendants disclosed information about the Company's business and plans.

105.   The market price of Bioenvision's securities increased significantly as investors belatedly learned the facts that had been concealed by defendants during the Class Period. Plaintiffs and other members of the Class therefore have suffered substantial damages as a direct and proximate result of the misconduct committed by defendants.

106.   By reason of the foregoing, Perseus-Soros knowingly or recklessly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that he: (a) employed devices, schemes and artifices to defraud; (b) made material omissions and/or misrepresentations of fact and failed to disclose material facts necessary in order to make their statements, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon

Plaintiffs and other members of the Class in connection with their sales of Bioenvision's securities during the Class Period.

## COUNT III

### For Violations of §20(a) of the Exchange Act
### (Against Perseus-Soros and the Individual Defendants)

107.    Plaintiffs repeat and reallege each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein.

108.    Defendant Perseus-Soros and the Individual Defendants were the controlling persons of Bioenvision within the meaning of Section 20(a) of the Exchange Act. By reason of their controlling positions as senior executives, Board members and/or controlling shareholders of Bioenvision, Defendant Perseus-Soros and the Individual Defendants had the power and authority to, and did exercise the same, to cause Bioenvision to engage in the wrongful conduct complained of herein.

109.    By reason of such wrongful conduct and their positions of control and the exercise thereof, Defendant Perseus-Soros and the Individual Defendants are liable pursuant to §20(a) of the Exchange Act for the violations described in Count I, and the paragraphs incorporated therein.

110.    As a direct and proximate result of Defendant Perseus-Soros and the Individual Defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their sales of Bioenvision stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment and relief as follows:

A.    Declaring that this lawsuit is properly maintainable as a class action and certifying plaintiffs as representatives of the Class under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be determined at trial, together with prejudgment interest at the maximum rate allowable by law;

C.      Awarding plaintiffs and the Class their costs and disbursements and reasonable allowances for plaintiffs' counsel and experts' fees and expenses; and

D.      Granting such other and further relief as may be just and proper.

Dated: November 26, 2007

Respectfully Submitted,

_____
Lee Squitieri
SQUITIERI & FEARON, LLP
32 East 57th Street
12th Floor
New York, New York 10022
Tel:  (212) 421-6492
Fax:  (212) 421-6553

Lead Counsel for Plaintiffs

Robert I Harwood
Jeffery M. Norton
HARWOOD FEFFER LLP
488 Madison Avenue
New York, New York 10022
Tel:  (212) 935-7400
Fax:  (212) 753-3630

Jules Brody
STULL, STULL & BRODY
6 East 45th Street
New York, New York 10017
Tel: (212) 687-7230
Fax: (212) 490-2022

Counsel for Plaintiffs