# EXHIBIT C

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF NEW YORK – COMMERCIAL DIVISION

------------------------------------------------------------------x

DAVID P. LUCI,                                          :

                     Plaintiff,                       :

        -against-                                    :        VERIFIED COMPLAINT

BIOENVISION, INC., JOSEPH COOPER,                       :
MICHAEL KAUFFMAN, JAMES SCIBETTA,
STEVEN A. ELMS, ANDREW N. SCHIFF, and
THOMAS SCOTT NELSON

                Defendants.

------------------------------------------------------------------

        Plaintiff, as and for his verified complaint against defendants, by his attorneys,

alleges as follows:

### The Parties

      1.     The plaintiff, David P. Luci ("Luci"), is a resident of Richmond County.

Plaintiff is an attorney licensed to practice law in the State of New York and was a certified

public accountant.

      2.     The defendant, Bioenvision, Inc. ("Bioenvision"), is a Delaware

corporation with its principal offices in New York City.

      3.     The defendant, Joseph Cooper ("Cooper"), is, upon information and

belief, a citizen and resident of the State of Arizona.

      4.     The defendant, Michael Kauffman ("Kauffman"), is, upon information

and belief, a citizen and resident of the Commonwealth of Massachusetts.

5.    The defendant, James Scibetta ("Scibetta"), is, upon information and belief, a citizen and resident of the State of New Jersey.

6.    The defendant, Stephen A. Elms ("Elms"), is, upon information and belief, a citizen and resident of the State of New York.

7.    The defendant, Andrew N. Schiff ("Schiff") is, upon information and belief, a citizen and resident of the State of New York.

8.    The defendant, Thomas Scott Nelson ("Nelson"), is, upon information and belief, a citizen and resident of the United Kingdom.

Jurisdiction And Venue

9.    The acts complained of in this complaint took place primarily in the State of New York at the Manhattan offices of Bioenvision or of Perseus-Soros Biopharmaceutical Fund L.P. ("Perseus-Soros"). The individual defendants who are not citizens and residents of the State of New York (Kauffman, Cooper, Scibetta and Nelson) are subject to jurisdiction in this Court because they committed tortious acts described in this complaint within the State of New York or committed tortious acts outside the State of New York which damaged the plaintiff who is a resident of the State of New York and suffered damages in this State.

10.    Venue is proper in this Court because the causes of action arose here and because the employment agreement between the plaintiff and the defendant Bioenvision mandates that any action arising out of that employment agreement must be venued in the State of New York, County of New York.

Statement Of Facts

11.    From July 22, 2002 until July 26, 2007, the plaintiff was employed by the defendant Bioenvision in various capacities. Plaintiff at various times served as Bioenvision's

2

Director of Finance, General Counsel, Chief Financial Officer, principal accounting officer and Corporate Secretary. Pursuant to an amendment to his Employment Agreement effectuated on January 6, 2006, the plaintiff was induced to relinquish the title of Chief Financial Officer and was asked to assume new responsibilities (supposedly by way of promotion) to become the Executive Vice President of Bioenvision.

12.     Plaintiff, formerly a senior associate in the Corporate Department at a Park Avenue law firm in New York City, was recruited by Bioenvision's then-existing Board of Directors (the "Board") in 2002 to develop Bioenvision into a mature company ripe for sale. Plaintiff accepted a position with Bioenvision, initially as its Director of Finance, General Counsel, Chief Financial Officer and Corporate Secretary, at significantly reduced salaried compensation based upon the Board's assurances that if plaintiff were to assist in building Bioenvision successfully, plaintiff would reap significant financial rewards for his efforts upon the sale of Bioenvision.

13.     In reliance on the Board's assurances, as described in paragraph 12 above, plaintiff resigned his position at this law firm and agreed to terms of employment, the terms of which were initially recorded in an employment agreement dated as of March 31, 2003 (the "Luci Employment Agreement"). On April 10, 2003, plaintiff and Bioenvision entered into an amendment to the Luci Employment Agreement pursuant to which the plaintiff will be entitled to a tax indemnity with respect to certain payments made to plaintiff under the Luci Employment Agreement. Copies of the Luci Employment Agreement and of the amendment dated April 10, 2003 are annexed hereto as Exhibits 1 and 2, respectively.

14.     Working with Bioenvision's other executives, plaintiff was successful in building Bioenvision over his five year tenure from a "virtual" and "development stage"

3

company into a successful new drug development enterprise. Yet, plaintiff was wrongfully terminated just weeks before he would potentially reap his contractual benefits upon the closing of an impending merger among Wichita Bio Corporation ("Wichita Bio"), Genzyme Corporation ("Genzyme") and defendant Bioenvision.

15.    As will be seen, the defendants have conspired among themselves to reap the benefits of this merger opportunity for themselves and their affiliates and to deny those benefits, and all of the other benefits to plaintiff under the Luci Employment Agreement, notwithstanding the terms of the Luci Employment Agreement, his day-to-day role over a five (5) year period in building Bioenvision into a viable drug company and, conversely, the relatively minor contributions of the individual defendants to building Bioenvision.

16.    The individual defendants other than Scibetta and Nelson (Cooper, Kauffman, Elms and Schiff) are directly or indirectly under common control with a well-known venture capital fund known as Perseus-Soros. Perseus-Soros was until recently the single largest shareholder of Bioenvision and the sole holder of all of the preferred stock issued by Bioenvision, which preferred stock confers certain special rights and benefits including, without limitation, the right: (a) to receive an annual 5% dividend, cumulative in arrears; (b) to increase or decrease the size of the board of directors of Bioenvision; and (c) to vote separately (from all other stockholders) as a class on any material financing, acquisition or disposition of, or by, Bioenvision. As such holder, Perseus-Soros exercised a position of control over Bioenvision's Board of Directors and over Bioenvision. Defendants Elms and Schiff are employees of Perseus-Soros. Kauffman is a principal of a biotechnology company in which Perseus-Soros has had a significant investment. Cooper is employed by another life sciences company, Medicis, which also has or has had extensive business dealings with Perseus-Soros and/or its senior

management. Both Messrs. Cooper and Kauffman were recommended to become members of Bioenvision's Board of Directors by Perseus-Soros. Elms and Schiff were members of the board from 2002 until June 2007 when they resigned.

17.     This action arises out of the desire of the Perseus-Soros representatives (Elms, Schiff, Kauffman and Cooper) and defendant Nelson, as members of Bioenvision's Board of Directors, in conjunction with the individual defendant Scibetta (collectively, the "individual defendants"), to deprive the plaintiff of the benefits of the Luci Employment Agreement, including the plaintiff's entitlement upon a "change of control" of Bioenvision to receive very significant after tax compensation from Bioenvision.

18.     Plaintiff has been informed that, beginning in January 2007, Genzyme, Inc. ("Genzyme") and Perseus-Soros secretly agreed upon a course of action pursuant to which Genzyme would make a tender offer to acquire all of the outstanding Bioenvision stock owned by Perseus-Soros and the public stockholders (including management of Bioenvision) and then merge Bioenvision into a wholly-owned subsidiary of Genzyme created for such purpose, Wichita-Bio Corporation (Wichita-Bio). This transaction has been agreed to and has been publicly announced.

19.     In an effort to avoid a multimillion dollar obligation to plaintiff under his Employment Agreement (either in the event of a merger or upon a termination without cause), the individual defendants engaged in a pattern of defamation of the plaintiff (consisting of both libel and slander) which was designed to force the plaintiff to resign, or failing such resignation, to manufacture an excuse to claim that Bioenvision was entitled to terminate the Luci Employment Agreement "for Cause," the effect of which would be to deprive plaintiff of all of the financial emoluments he is otherwise entitled to under the Luci Employment Agreement, as

5

amended, including future salary, bonus, vested stock option grants, unvested stock option grants, and all of the other monetary benefits (and significant tax benefits) provided for in such agreement.

20.    To accomplish their purpose of ridding Bioenvision of the plaintiff and his employment agreement, the individual defendants have, as will be seen below, falsely accused the plaintiff of having engaged in wrongdoing (even fraud) in the fulfillment of his corporate responsibilities and have also wrongfully accused plaintiff of being dishonest and disloyal as well as "insubordinate." This action seeks damages for this wrongful conduct by the individual defendants and the corporate defendants on whose behalf they engaged in these activities, as well as punitive damages arising from the malicious, wanton and willful nature of these activities and statements, which were motivated to deprive plaintiff of his contractual entitlements and also enhance the return to Perseus-Soros from the pending transaction among Wichita Bio, Genzyme and Bioenvision.

<u>FIRST CAUSE OF ACTION</u>
(Against Bioenvision)

21.    Repeats and realleges the allegations set forth in paragraphs "1" through "20" above with the same force and effect as if fully set forth at length herein.

22.    Pursuant to the Luci Employment Agreement, plaintiff Luci was to serve initially as Director of Finance, General Counsel and Corporate Secretary and report directly to Bioenvision's CEO, Dr. Christopher Wood. In such capacity, Mr. Luci served as Bioenvision's General Counsel and its principal accounting officer, worked in Bioenvision's New York City office and was the highest ranking official in that office (and the only corporate officer until he hired subordinates).

23.     Pursuant to Exhibit 2 , any compensation which was payable to plaintiff pursuant to Section 4 of the Luci Employment Agreement upon a Change of Control of Bioenvision was to be paid on an after-tax basis (with a complete "tax make-whole" for any and all federal income or excise tax, or state or local taxes otherwise payable by Luci).

24.     Effective as of January 6, 2006, plaintiff and Bioenvision entered into a further amendment to the Luci Employment Agreement, a copy of which is annexed hereto as Exhibit 3. Plaintiff entered into this amendment upon being told repeatedly by members of Bioenvision's board that he was being promoted to Executive Vice President, General Counsel and Corporate Secretary, and that his responsibilities as a corporate officer were being expanded to accord with his new title. This amendment to the Luci Employment Agreement provided for Luci to relinquish his duties and titles as Chief Financial Officer, Principal Financial Officer and/or Principal Accounting Officer should Bioenvision engage an individual to perform such duties. This amendment reiterated that the plaintiff was to report to Bioenvision's CEO, Dr. Wood. In connection with and in consideration for this amendment to the Luci Employment Agreement, Bioenvision granted plaintiff 50,000 shares of its common stock, without restriction. Plaintiff, in fact, received 31,100 shares because Bioenvision withheld the balance as a withholding tax payment. At all times, defendant Kauffman referred to this change in employment as a "promotion" and an "increase" in responsibilities. At the time of this amendment, Dr. Wood insisted that plaintiff needed to remain directly involved with maintaining relations with Bioenvision's outside auditors and certain members of the investor community with whom plaintiff had developed strong ties.

25.     The occasion for this lawsuit is that on July 26, 2007, the plaintiff received a letter from Dr. Wood, Bioenvision's CEO, a copy of which is annexed hereto as Exhibit 4,

which letter purported to confirm that Bioenvision "has elected to terminate your employment 'for Cause' effective immediately today, July 26, 2007" (the "Termination Notice"). The Termination Notice refers to a meeting between Dr. Wood and plaintiff on Wednesday, July 18, 2007. In fact, such a meeting occurred at Citigroup Center in New York City on that day. At this meeting, Dr. Wood informed plaintiff that defendants Cooper, Kauffman and Nelson had decided that the plaintiff should be terminated "for Cause" due to plaintiff's supposed "insubordination" if plaintiff did not voluntarily resign shortly. Dr. Wood further informed plaintiff that, in the face of an otherwise unanimous Board vote, and due to other personal considerations, he also voted for the decision. The plaintiff was informed by Dr. Wood that the insubordination being alleged related solely to the plaintiff's provision of information about the plaintiff's Employment Agreement, as amended, to Genzyme, as part of Genzyme's due diligence with respect to the pending merger of Bioenvision into Genzyme's subsidiary, Wichita Bio, as described herein. Dr. Wood's words at this meeting were: "I agree that this is hogwash, but they are going to try to get away with it if you don't settle and resign." At this same meeting, Dr. Wood elaborated by saying: "You have done nothing wrong, and there are no valid grounds for your dismissal, but Kauffman and Cooper are just out to get you." Given the delivery of the Termination Notice on July 26, 2007, it appears that Messrs. Cooper, Kauffman and, perhaps, Mr. Nelson, who is also a Bioenvision director (who, upon information and belief, also voted for the decision to terminate the plaintiff), are indeed intent on "trying to get away with it."

26.     There is, however, no truth to the alleged "insubordination." Indeed, as Dr. Wood has acknowledged, the provision of information about the plaintiff's employment agreement was done at the request of Genzyme and at the direction and encouragement of Dr. Wood to whom, as noted above, the plaintiff directly reported.

8

27.    This July 26, 2007 Termination Notice was not, as will be seen, the first attempt by the defendants to assert a factually baseless claim of termination "for Cause" with respect to plaintiff.

28.    As a result of the foregoing, the plaintiff has been terminated wrongfully and unfairly and has thus far been deprived of the benefits of the Luci Employment Agreement, by actions which have damaged the plaintiff in an amount to be ascertained at trial, but which damage is believed to be well in excess of $9.1 million which is the approximate amount to be paid to plaintiff or on his behalf under the Luci Employment Agreement , as calculated by one of Bioenvision's outside law firms.

## SECOND CAUSE OF ACTION
### (Against Bioenvision And
### The Individual Defendants)

29.    Repeats and realleges the allegations set forth in paragraphs "1" through "28" above with the same force and effect as though fully set forth at length herein.

30.    At all times since the execution of the Luci Employment Agreement, Bioenvision owed Luci a duty to deal with him in good faith and fairly.

31.    The efforts of Bioenvision and the individual defendants to concoct a 'for Cause" termination on the eve of the closing of a Change of Control transaction with Genzyme breached the covenant of good faith and fair dealing owed by Bioenvision to Luci pursuant to the Luci Employment Agreement, as amended.

32.    In addition to this breach, the conduct of the individual defendants and Bioenvision over the past two years has involved  an unfortunate number of instances in which the individual defendants and Bioenvision have defamed the plaintiff and otherwise interfered

with the plaintiff's performance of his corporate responsibilities under the Luci Employment Agreement.

33.     For example, in March 2007, the defendants Scibetta, Elms, Schiff, Cooper and Kauffman orchestrated an "Audit Committee fraud investigation" by Bioenvision of the plaintiff during the course of which the defendants Scibetta, Elms, Schiff, Cooper and Kauffman defamed the plaintiff by accusing him of "fraud" and negligence by alleging that the plaintiff had "bypassed internal controls" at Bioenvision and managed to have Bioenvision award plaintiff a $5,000 "bonus," which Scibetta, Elms, Cooper, Kauffman and Bioenvision alleged evidenced a material weakness in the Company's internal controls, or a fraud by the plaintiff.  Upon information and belief, the defendant Scibetta republished this libel and slander in conversations and communications over the Internet with, inter alia, the defendant Elms (the Chairman of the Audit Committee), with Dr. Wood (Chairman and CEO of Bioenvision), director Nelson, and also with the defendant Kauffman (also a member of the Bioenvision Audit Committee).  Upon information and belief, the defendants Scibetta, Schiff, Elms, Cooper and Kauffman further republished this defamation in connection with conversations they had with Bioenvision's auditors at J.H. Cohn & Co., LLP, with other Bioenvision executives, including Hugh Griffith, and with representatives of JP Morgan Chase Securities, which was then in the process of raising equity capital for Bioenvision, all of which occurred in March 2007.

34.     In fact, the plaintiff requested that Dr. Wood award him a $5,000 salary increase (not a bonus) as per the Luci Employment Agreement to compensate plaintiff for commutation expenses similar to those commutation expenses that had been awarded to Scibetta when Scibetta agreed to become Chief Financial Officer of Bioenvision.  After review, Dr. Wood concurred with plaintiff's request (which plaintiff is clearly entitled to under the Luci

Employment Agreement) and confirmed this entitlement to the plaintiff by writing and signing a letter to the plaintiff confirming that award. The salary increase awarded by Dr. Wood (payable in twenty four equal installments) was then implemented through Bioenvision's regular payroll practices by Luci. It is clear that Scibetta, Schiff, Elms and Kauffman were not truly interested in conducting an Audit Committee investigation, but were only interested in defaming plaintiff and in attempting to manufacture a basis to force plaintiff to resign or to terminate the plaintiff "for cause" in order to avoid severance and other termination obligations to plaintiff that would be triggered if the Board were unable to find "cause.' Perhaps the best evidence that this was their true motive is that each of them declined to review (or even receive a copy of) Dr. Wood's confirmation letter relating to this salary increase, which plaintiff offered to provide to Scibetta before the Audit Committee began its "investigation." A copy of this letter was only requested (by defendant Elms) after Mr. Spelker of J.H. Cohn & Co., LLP, Bioenvision's outside auditors, had reviewed the facts, met with Elms, and informed Elms that there was absolutely no basis for the assertion of fraud or any inappropriate conduct by plaintiff.

35.    In order to justify the conduct of an Audit Committee investigation, Scibetta misled the Audit Committee and the plaintiff by stating that this salary increase (which he mistakenly called a "bonus") had come to light as a result of the "testing of internal controls" conducted by Bioenvision's outside auditing firm, J.H. Cohn, LLP. When informed of this supposed "fact" during the Audit Committee investigation, the auditors at J.H. Cohn, LLP denied that Scibetta's claim was factually based, and pointed out that this alleged "coming to light" could not have occurred as Scibetta claimed, because the auditors had not yet commenced any "testing of internal controls" at Bioenvision. The auditors also pointed out that plaintiff was specifically entitled to this salary increase in his employment agreement and that payment of the

11

$5,000 salary increase was appropriately authorized by the CEO of Bioenvision in a letter to plaintiff.

36.     When the Audit Committee concluded that no wrongdoing by plaintiff had occurred and that there were no material weaknesses in Bioenvision's internal controls, or fraud by plaintiff, plaintiff requested written confirmation of the conclusions of the Committee. However, the Audit Committee, in the persons of Messrs. Elms and Kauffman, declined to create minutes of their deliberations or of the evidence presented to them and refused to apologize to Mr. Luci or to provide him with any evidence of his complete exoneration from a fraud charge that, given plaintiff's status as an attorney at law and a highly placed corporate executive, constituted the rankest form of slander in the corporate world. The effects of this Audit Committee investigation also took place at an important moment for Bioenvision which was at that time in the middle of a private equity offering managed by J.P. Morgan Chase Securities. J.P. Morgan Chase Securities had insisted that Dr. Wood, plaintiff and Scibetta be the team of executives to conduct Bioenvision's "road show." Given the pendency of the Audit Committee's fraud investigation (albeit baseless), plaintiff was excluded from participating in that financing activity and was effectively prevented from performing his responsibilities as Executive Vice President and General Counsel, a circumstance which damaged plaintiff's reputation in the financial community even further. Also, in this financing, defendant Scibetta intentionally excluded plaintiff Luci from the process of drafting and negotiating legal documentation for the financing by interacting directly with outside counsel despite being told repeatedly that this behavior was inappropriate given plaintiff's position as chief legal counsel of Bioenvision.

37.     After not receiving an apology (oral or written) or any written evidence of exoneration, plaintiff was approached by Mr. Chris Denn of Goodwin Procter LLP, at that time

counsel to Kauffman in several capacities, for an open discussion about "what is going on at

Bioenvision." Mr. Denn described corporate life at Bioenvision as "complete chaos." Plaintiff

indicated clearly that if Kauffman and Cooper and Elms intended to "take Bioenvision in a

different direction, they only needed to honor Bioenvision's contractual obligations." Plaintiff

also suggested to Denn that Kauffman and Cooper should behave like directors of a public

company and, among other things, have minutes recorded of their meetings and decisions.

Plaintiff had repeatedly complained to Kauffman about the lack of notice, formality and

recording of board actions, but Kauffman was adamant and, in his own words, "unforgiving" of

plaintiff for his constructive advice.

      38.    Notwithstanding the failure of the Audit Committee investigation to give

rise to a claim of termination for Cause, the defendants Elms, Schiff (Elms's co-employee at

Perseus-Soros), Kauffman and Cooper proceeded in collaboration with Scibetta to isolate

plaintiff from his day to day responsibilities at Bioenvision, thereby constructively terminating

him from his executive positions with the firm, aggressively seeking to eliminate plaintiff's

administrative, legal and development responsibilities. Scibetta and Elms also eliminated

plaintiff's role with respect to the company's U.S. payroll, despite the fact that the auditors

asserted that plaintiff was the most appropriate manager to perform these duties.

      39.    This isolation was accomplished by, inter alia, transferring responsibility

for payroll from the plaintiff to another New York Bioenvision employee, i.e., plaintiff's

secretary. Plaintiff was also instructed no longer to participate in the planning (with outside

counsel and Bioenvision's board of directors) of legal strategy and potential litigation against

Genzyme arising out of Genzyme's Co-Development Agreement with Bioenvision for the

oncology drug known as clofarabine. Prior to this instruction, plaintiff had been running all

these processes, serving as Bioenvision's principal liaison with outside counsel in the development of a strategy for redressing what Bioenvision's board of directors repeatedly and unanimously claimed that they believed were ongoing breaches of the Co-Development Agreement by Genzyme and other wrongful conduct by Genzyme in failing to cooperate with Bioenvision's clinical tests of clofarabine, in Europe and other matters. Plaintiff and Dr. Wood had also served as liaison to Genzyme in all matters relating to the Co-Development Agreement. Excluding plaintiff from these processes had the effect of removing one of plaintiff's principal activities as Bioenvision's General Counsel and was clearly intended to lessen plaintiff's influence on the future direction of the business and his perceived importance to Bioenvision with outsiders and Bioenvision employees. Scibetta's also refused to direct questions of a legal nature to plaintiff, despite being told by Dr. Wood and plaintiff that this conduct was inappropriate because of plaintiff's position. This refusal intentionally undermined plaintiff's authority and prevented plaintiff from executing his duties. Scibetta, for example, repeatedly went directly to Kristen Dunker, plaintiff's "subordinate," for legal advice and documents, despite being requested by Dr. Wood to pose all legal questions and issues to plaintiff directly. Scibetta also undermined plaintiff's authority with respect to corporate development in Japan.

        40.     Moreover, during most of the years 2006 and 2007, Scibetta engaged in private conversations with Dr. Wood and others, including Cooper, Kauffman, Elms, Schiff, Nelson and Hugh Griffith (Bioenvision's Chief Operating Officer) in which conversations Scibetta referred to the plaintiff as "back wash" and generally advocated terminating the plaintiff from Bioenvision's employ on the ground that Bioenvision "needed' to separate itself from the plaintiff. These conversations are known to the plaintiff to have occurred in January 2007 in Edinborough, Scotland at a management team meeting, and in March 2007 in New York City

when, in a lunch conversation with Dr. Wood, Scibetta stated that "Luci needed to be terminated." In Chelsea, England, in April 2007, during strategic planning meetings with an outside consulting firm, Scibetta referred to the plaintiff as "a cancer on the Company." The only factual basis asserted by Scibetta for his repeated slanders of plaintiff was the fact that the plaintiff had exercised his rights as a shareholder of Bioenvision and had sold 200,000 shares of Bioenvision common stock during the first quarter of 2006. The plaintiff, however, was not in any way constrained or prohibited by contract or law from alienating those shares at that time and he was also not the only officer of Bioenvision to sell shares at that time. Indeed, several other executives and two directors of Bioenvision sold shares at or about the same time. This slanderous effort by Scibetta was consistent with the later efforts by Scibetta, Elms, Cooper, Schiff and Kauffman with respect to the ill-fated Audit Committee investigation to "trump up" a basis to get rid of Luci "for cause," which effort culminated in the July 26, 2007 "Termination Notice."

41.    The Termination Notice referred to above is based on nothing of substance either. For example, the sole stated basis for asserting a termination "for Cause" is the provision of compensation information to Genzyme which is referred to above. That conduct was, however, performed at the express direction of plaintiff's superior, Dr. Wood, and was lawful and appropriate under the circumstances of a pending sale of Bioenvision to Genzyme. In reality, the decision to terminate plaintiff was the culmination of two years of effort on the part of Messrs. Elms, Schiff, Cooper and Kauffman (and most recently Scibetta and Nelson) to separate the plaintiff from Bioenvision and to do so as inexpensively as possible from Bioenvision's perspective, by avoiding the contractual obligations of Bioenvision under the Luci Employment Agreement, as amended. To that end, during the week preceding the delivery of

the Termination Notice, the defendants attempted to persuade plaintiff to resign by threatening a termination for Cause if he did not resign, taking advantage of the fact that during this week, counsel for Bioenvision (really counsel for Cooper and Kauffman and, thus, Perseus-Soros) knew that plaintiff's own counsel was in California on a previously planned business trip. During this week, Bioenvision twice made offers designed to expire before plaintiff's counsel would return to New York. Plaintiff did not succumb to this pressure and rejected both offers.

42.    By reason of the foregoing acts of defamation, bad faith and unfair dealing, plaintiff has been damaged in his reputation and he has been deprived of the benefits of the Luci Employment Agreement, and his vested and unvested Bioenvision options have been terminated wrongfully. He also has been deprived of his right to future salary and benefits under the Luci Employment, any bonus payable thereunder and the other emoluments of his position.

### THIRD CAUSE OF ACTION
(For Declaratory Judgment)
(Breach of the Luci Employment Agreement)

43.    Repeats and realleges the allegations set forth in paragraphs "1" through "42" above with the same force and effect as though fully set forth at length herein.

44.    Upon information and belief, a representative of Perseus-Soros met with Genzyme's representatives in January 2007 in order to convince Genzyme to acquire Bioenvision, or, in the alternative, to acquire the shares of Bioenvision's common stock and preferred stock owned by Perseus-Soros.

45.    Thereafter, the representatives of Perseus-Soros on the Bioenvision Board of Directors (defendants Elms, Schiff, Cooper and Kauffman) determined to accept an offer from Genzyme to acquire Bioenvision or all of its shares without an auction or any genuinely serious

16

effort to ascertain whether there was another potential buyer which might be willing to pay more for Bioenvision than Genzyme had indicated it was willing to pay.

46.    To that end, the Perseus-Soros representatives on the Board of Directors of Bioenvision invited an offer from Genzyme, which offer was eventually made in April 2007 at an initial price of $5.25 per share. The Perseus-Soros members of the Board insisted that Bioenvision's management must agree to sell their shares of Bioenvision's common stock to Genzyme. Ultimately, on May 29, 2007, Bioenvision and Genzyme entered into a Merger Agreement to effectuate the transaction described above at a price of $5.60 per share. The merger was designed in two steps. The first step was to be a tender offer by Wichita Bio for all of the outstanding common stock held by the public, Perseus-Soros and Bioenvision management. As noted above, Perseus-Soros insisted that Bioenvision management (including plaintiff) agree to sell their shares to Genzyme in that tender offer. The tender offer was launched on June 4, 2007. Management, including plaintiff, tendered their shares in such tender offer. Genzyme separately acquired the preferred stock owned by Perseus-Soros and Perseus-Soros tendered its shares of common stock to Genzyme in the tender offer. As indicated above, plaintiff had a "tax make-whole" in his amended Employment Agreement relating to this tender, which has not been honored by Bioenvision. As some evidence that the marketplace did not view $5.60 (the adjusted merger price) as full value, very, very few Bioenvision shares other than management shares and Perseus-Soros common shares were tendered in the tender offer to Wichita Bio.

47.    Pursuant to the Luci Employment Agreement, as amended, plaintiff is entitled upon a Change of Control to various financial benefits, including a severance payment, a tax "make whole," and an accelerated vesting of options. As noted above, the total benefit of his

17

entitlements under the Luci Employment Agreement upon a Change of Control exceeds $9.2 million, as calculated by one of Bioenvision's outside law firms (Paul Hastings).

        48.    The effort to deny plaintiff his entitlements under the Luci Employment Agreement is also self evident from the fact that the members of the board of directors of Bioenvision met secretly on March 16, 2007 to discuss the anticipated offer from Genzyme which had been privately discussed between Perseus-Soros and Genzyme, as indicated above. At this meeting-- to which plaintiff was not invited notwithstanding his status as Corporate Secretary -- the members of the board of directors informed Dr. Wood that it was the board's desire for Dr. Wood to retire from Bioenvision as soon as a replacement CEO could be hired, and that it was the further desire of the board that the plaintiff would either resign or be terminated upon the conclusion of the Audit Committee investigation referenced above. Dr. Wood, like plaintiff, has an employment agreement which entitles him to significant compensation upon a Change of Control. To the best knowledge and information of the plaintiff, no minutes were ever taken of this meeting of the Board of Directors of Bioenvision other than a contemporaneous memorandum prepared by Dr. Wood which was furnished to the plaintiff. Upon information and belief, defendant Kauffman was quite annoyed that a written record of this meeting existed given his preference for undocumented corporate actions and meetings. According to Dr. Wood, it became apparent to him at this unscheduled "board meeting" that the defendant Scibetta had been in constant contact with the defendants Elms, Schiff, Cooper and Kauffman and that these five defendants were aligned in seeking secretly to separate plaintiff, Dr. Wood and other Bioenvision executives from the company, regardless of their existing contracts.

defendant Bioenvision because of the July 26, 2007 Termination Notice which is an attempt by Bioenvision and its Perseus-Soros dominated Board of Directors to eliminate the financial obligations rightfully owed to the plaintiff under the Luci Employment Agreement, as amended.

50.     Plaintiff is entitled to a declaratory judgment that he was terminated without cause and is therefore entitled to the severance payments outlined in his employment agreement, and further, that upon a change of control (as defined in the Luci Employment Agreement), the plaintiff is entitled to all of the benefits owed to him under the Luci Employment Agreement, as amended, as calculated by Paul Hastings, a copy of which calculation is annexed hereto as Exhibit 5, and to such ancillary and supplemental relief as the Court shall determine upon the entry of declaratory relief.

### FOURTH CAUSE OF ACTION
(Against Scibetta)

51.     Repeats and realleges the allegations set forth in paragraphs "1" through "50" above with the same force and effect as though fully set forth at length herein.

52.     As referred to above, Scibetta has maliciously libeled and slandered plaintiff on several occasions.  On numerous occasions outlined above, Scibetta accused the plaintiff, an attorney, of committing fraud, under circumstances such that the other parties to whom such accusation was made would have understood that the claim of fraud subsumed a claim of theft as well.

53.     As a result of these repeated libelous and slanderous statements, plaintiff has suffered to date at least $9.1 million in compensatory damages in lost compensation.  In light of the malicious, wanton and willful nature of this conduct, plaintiff is also entitled to punitive

damages in an amount to be determined at trial and consequential and special damages for the multiple injuries to his reputation.

FIFTH CAUSE OF ACTION
(Against Defendants Cooper, Kauffman,
Elms, Schiff and Nelson)

54.     Repeats and realleges the allegations set forth in paragraphs "1" through "53" above with the same force and effect as though fully set forth at length herein.

55.     As referred to above, the defendants Cooper, Kauffman, Elms and Schiff, as de facto representatives of the interests of Perseus Soros, had a conflict of interest in serving as members of the board of directors of Bioenvision. This conflict caused them to embrace a transaction with Genzyme rather than to pursue alternatives for the betterment of Bioenvision's public shareholders.

56.     The plaintiff zealously tried to fulfill his obligations to Bioenvision. Yet, beginning sometime in 2005, the defendants Elms and Schiff (joined in 2006 by the defendants Cooper, Kauffman and Nelson) began to take steps to marginalize plaintiff, to slander him to third parties and other Bioenvision executives and directors and surreptitiously decided to have Bioenvision hire Scibetta to replace Luci.

57.     Because the Luci Employment Agreement did not permit Bioenvision to replace Luci, the defendants Elms, Schiff, Kauffman, Cooper and Nelson misrepresented to the plaintiff that the Board's (and their) desire was to "promote" plaintiff to Executive Vice President and to bring on a new executive to serve as Chief Financial Officer. To that end, these five directors approved the issuance of 50,000 new shares as an ostensible "reward" for this promotion. Plaintiff, in reliance on these representations, entered into the amendment to his

20

employment agreement annexed hereto as Exhibit 3. Plaintiff paid income tax on these new

shares, consistent with the shares being represented as compensation for his promotion.

58.    After plaintiff executed the amendment to his employment agreement, Bioenvision engaged Scibetta as Chief Financial Officer. Immediately thereafter, the defendants Cooper and Kauffman (who had effectively joined Elms and Schiff as Perseus Soros representatives on the Bioenvision board) engaged in "revisionist history" by describing the 50,000 shares as payment for a "waiver" of plaintiff's rights under his employment agreement rather than a promotion. (If that had in fact been the basis for the receipt of shares, there should not have been tax withholding on the issuance).

59.    The "trumped up" Audit Committee investigation, the deceit in inducing plaintiff to amend his employment agreement, the retroactive "slashing" of plaintiff's severance entitlement at a meeting on June 6, 2007 (at which these defendants changed their mind about the plaintiff's entitlement to severance and cut it more than half from the amount previously disclosed to the public in an exhibit to the Merger Agreement among Bioenvision, Genzyme and Wichita Bio) and, now, the unsupportable alleged termination for "cause" demonstrate the ill will and malice which has been evidenced by the defamation of the plaintiff over the past two years by the defendants Cooper, Kauffman, Scibetta, Schiff, Elms and Nelson, which defamation has continued with their ongoing publication that plaintiff was terminated "for cause." All of this conduct has also been designed to and was intended to interfere with the plaintiff's rights under the Luci Employment Agreement with Bioenvision, to plaintiff's considerable injury and damage.

WHEREFORE, based upon the foregoing, the plaintiff hereby demands judgment as follows:

(a)    On the first cause of action against the defendant, Bioenvision, for breach of contract, compensatory damages in the amount of at least $9.2 million and punitive damages in the amount of $15.0 million;

(b)    On the second and third causes of action against the defendants, for breach of contract, compensatory damages in the amount of at least $9.2 million and a declaration that the plaintiff was terminated without cause, wrongfully and in breach of the Luci Employment Agreement, plus ancillary relief and supplemental damages as the Court shall determine and for breach of fiduciary duty, compensatory damages in an amount to be determined at trial, plus punitive damages in an amount to be determined at trial;

(c)    On the second and third causes of action, compensatory damages for defamation in the amount of at least $15.0 million, plus punitive damages in the amount of at least $5.0 million;

(d)    On the fourth cause of action, compensatory damages in the amount of $12.5 million and punitive damages in the amount of $12.5 million;

(e)    On the fifth cause of action, compensatory damages in the amount of $15.0 million and punitive damages in the amount of $15.0 million ; and

22

(f)     Such other and further relief as to this Court may seem just and proper, including costs and attorneys' fees.

Dated: New York, New York
          August 22, 2007

CROWELL & MORING LLP
Attorneys for Plaintiff David P. Luci
153 East 53rd Street
New York, New York 10022
Tel. No.: 212-223-4000