UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
BERT VLADIMIR, Individually and On Behalf Of  :          07 Civ. 6416 (SHS)
All Others Similarly Situated,                :
                                              :
                         Plaintiff,           :
                                              :          OPINION & ORDER
            -against-                         :
                                              :
BIOENVISION INC., CHRISTOPHER B. WOOD,        :
JOSEPH P. COOPER, STEVEN A. ELMS,             :
MICHAEL G. KAUFFMAN, ANDREW SCHIFF            :
JAMES S. SCIBETTA, and PERSEUS-SOROS          :
BIOPHARMACEUTICAL FUND, LP,                   :
                                              :
                         Defendant.           :
------------------------------------------------------------------x

SIDNEY H. STEIN, U.S. District Judge.

This securities fraud action arises from a merger between Bioenvision, Inc. and Genzyme

Corporation, two pharmaceutical companies.  Plaintiffs—sellers of securities in Bioenvision

during the period from April 11, 2007 through May 28, 2007 (the "class period")—bring this

putative class action against Bioenvision and six of its corporate officers and directors

(collectively, the "Bioenvision defendants"), and against Perseus-Soros Biopharmaceutical Fund,

LP ("Perseus-Soros"), the largest pre-merger shareholder in Bioenvision.  The action is brought

pursuant to section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule

10b-5 promulgated thereunder and includes both claims against Perseus-Soros for violation of

section 13(d) of the Exchange Act, 15 U.S.C. § 78m(d), and control person liability against the

individual defendants and Perseus-Soros pursuant to section 20(a) of the Exchange Act.  In their

supplemental amended class action complaint, plaintiffs claim that defendants artificially

deflated the value of Bioenvision's stock by issuing and by failing to correct or update

statements that contained material misrepresentations and omissions as to Bioenvision's plan to

enter into a merger with Genzyme.  As a result, plaintiffs allegedly sold their Bioenvision securities during the class period at prices below the actual value of those securities.

Defendants have now moved to dismiss the action pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.  They contend that the complaint does not plead securities fraud with the particularity required by Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub. L. No. 104-67, 109 Stat. 737 (1995) (codified in various sections of 15 U.S.C.), and therefore should be dismissed.  The defendants also argue that, contrary to plaintiffs' assertions, they had no duty to disclose the merger discussions until May 29, 2007, the date when the merger was announced publicly.

For the reasons set forth in this Opinion, defendants' motions to dismiss the complaint are granted without prejudice.  As alleged, the statements that form the basis of this action either did not give rise to a duty to disclose the merger discussions or are not pled with sufficient particularity.

## I.      BACKGROUND

The supplemental amended complaint alleges the following relevant facts, which the Court assumes to be true for the purposes of this motion to dismiss.

### A.      The Parties

Prior to its October 23, 2007 merger with Genzyme, Bioenvision was a Delaware biopharmaceutical corporation with its principal place of business in New York City.  (Supp. Am. Compl. ¶ 8.)

Perseus-Soros was, until the merger, the largest common stockholder of Bioenvision, owning approximately twenty percent of Bioenvision equity as of January 2007.  (Id. ¶ 9.)  Prior to and during the class period, Perseus-Soros exercised control over Bioenvision's Board of

Directors (the "Board") and the company itself.  (<u>Id.</u>)  Plaintiffs allege that as an insider to Bioenvision, Perseus-Soros had a duty to disclose all material non-public information concerning the company or to abstain from trading, and yet Perseus-Soros failed to amend its Schedule 13D/A to disclose the events leading up to the merger, specifically, Perseus-Soros's plan to change control of Bioenvision.  (<u>Id.</u>)

Two Bioenvision officers who were also board members have been named as individual defendants.  Christopher B. Wood was Bioenvision's Chairman and Chief Executive Officer. (<u>Id.</u> ¶ 10.)  James S. Scibetta served as the Chief Financial Officer of Bioenvision.  (<u>Id.</u> ¶ 16.) According to plaintiffs, Wood and Scibetta issued public statements and signed SEC filings on behalf of the company that were materially false and misleading.  (<u>Id.</u> ¶¶ 10, 16.)

The other individual defendants had connections to Perseus-Soros or Perseus-Soros affiliates.  Joseph P. Cooper served as a director of Bioenvision after Perseus-Soros recommended him to that position in 2006.  (<u>Id.</u> ¶ 11.)  He also served as the Executive Vice President of Medicis Pharmaceutical Corp. ("Medicis"), which had extensive business dealings with Perseus-Soros and its senior management.  (<u>Id.</u>)  Steven A. Elms at all relevant times served as a director of Bioenvision and as a managing director of Perseus-Soros Management LLC ("Perseus-Soros Management"), an affiliate of Perseus-Soros.  (<u>Id.</u> ¶ 12.)  Michael G. Kauffman served as a director of Bioenvision at all relevant times and served as President and Chief Executive Officer of Predix Pharmaceuticals ("Predix"), in which Perseus-Soros had a significant investment.  (<u>Id.</u> ¶ 13.)  Perseus-Soros recommended Kauffman to become a member

of the Board in 2004.  (Id.)  Andrew Schiff served as a director of Bioenvision and served as a

Managing Director of Perseus-Soros Management.  (Id. ¶ 14.)[1]

The lead plaintiffs in this putative class action are Bert Vladimir and Gary Thesling.

They sold Bioenvision securities during the class period and claim to have been injured by

defendants' conduct.  (Id. ¶¶ 4-5.)

B.      The Merger Timeline

Bioenvision developed a variety of pharmaceutical products, but its "flagship product"

was clofarabine, a drug for the treatment of pediatric leukemia that Bioenvision developed with

Genzyme in Europe under the brand name Evoltra.  (Id. ¶ 25.)  From 2005 to 2006,

representatives of Genzyme and Bioenvision met from time to time to discuss licensing

opportunities for clofarabine and to explore the possibility that Genzyme would acquire

Bioenvision.  (Id. ¶ 26.)

Beginning in August 2006, Genzyme took a number of steps that led to the eventual

acquisition of Bioenvision.  It engaged Banc of America Securities LLC ("BOA") as its

investment adviser.  (Id. ¶ 27.)  In January 2007, its executive vice president, Earl M. Collier,

met with Dennis Purcell, a Senior Managing Director of Aisling Capital, an investment manager

for Perseus-Soros.  (Id. ¶ 28.)  Collier discussed with Purcell the possibility that Genzyme might

be interested in acquiring Bioenvision.  (Id.)  Purcell suggested that Genzyme should speak

directly to Bioenvision about a possible acquisition.  (Id.)

The Complaint then makes allegations, not on plaintiff's own knowledge, but rather on

the basis of allegations made in a New York State litigation filed by former General Counsel and

Chief Financial Officer of Bioenvision, David P. Luci, that Bioenvision improperly terminated

---

[1] Among Cooper, Elms, Kauffman, and Schiff (the "Perseus-Soros-connected directors"), plaintiffs allege that all
but Cooper exercised control over Bioenvision.  (Id. ¶ 15.)  Presumably the omission of Cooper is an oversight by
plaintiffs.

his employment agreement.  Specifically, plaintiffs here allege on the basis of Luci's state court allegations that, after Collier and Purcell discussed the possibility of a Genzyme-Bioenvision combination, Genzyme and Perseus-Soros "secretly agreed upon a course of action pursuant to which Genzyme would make a tender offer to acquire all of the outstanding Bioenvision stock owned by Perseus-Soros and the public shareholders (including management of Bioenvision) and then merge Bioenvision into a wholly owned subsidiary of Genzyme."  (Id. (quoting Verified Am. Compl. of David P. Luci, Luci v. Bioenvision, No. 111478/07 (N.Y. Sup. Ct. Aug. 22, 2007) ("Luci Compl.") ¶ 18, Ex. C to Decl. of Maria J. Ciccia dated Feb. 29, 2008).)  After the January 2007 meeting between Collier and Purcell, the Perseus-Soros-connected directors, including Elms, Schiff, Cooper, and Kauffman, according to plaintiffs' quotation from Luci's state court complaint, "determined to accept an offer from Genzyme to acquire Bioenvision." (Id. ¶ 29 (quoting Luci Compl. ¶ 45).)

In March 2007, plaintiffs continue, Genzyme and Bioenvision became more involved in discussions and negotiations concerning a merger.  (Id. ¶¶ 33-34.)  On March 6, BOA sent Bioenvision requests for information from Genzyme, and on March 15, Wood sent an email to BOA requesting that Genzyme submit a bid specifying a price at which Genzyme would be prepared to acquire Bioenvision.  (Id. ¶¶ 33, 34(a).)  Again relying on Luci's employment action complaint as the basis of its allegations, plaintiffs allege that, the Bioenvision Board met "secretly" on March 16 to discuss the anticipated Genzyme offer, and the Perseus-Soros-connected directors allegedly insisted that Bioenvision's management agree to sell their shares of Bioenvision's stock to Genzyme.  (Id. ¶ 34(b) (citing Luci Compl. ¶ 48).)  According to Luci's complaint, as cited by plaintiffs here, Wood "believes" that Scibetta was in constant contact with the Perseus-Soros-connected directors during this time.  (Id. ¶ 34(c) (citing Luci Compl. ¶ 48).)

In early April 2007, Bioenvision put forward a dilutive public offering of 8 million shares of its common stock at a price of $3.75 per share.  (Id. ¶ 35.)  A Supplemental Prospectus issued in anticipation of the offering noted the challenges facing Bioenvision in realizing value from Evoltra, including the possibility that Genzyme might fail to meet the obligations of a co-development agreement with Bioenvision.  (Id. ¶ 37.)  It explained that the price of Bioenvision's common stock might decline, and that even if stockholders thought that a merger might be in Bioenvision's interest in the future, a number of factors might delay or prevent a merger from happening.  (Id.)  Finally, it noted that certain future events might have a dilutive effect on stockholders' shares.  (Id.)  No specific merger partner or other details were referenced.  (Id.)  As a result of this public offering, the price of Bioenvision stock declined from $4.09 on March 30, 2007 to $3.81 on April 4, 2007.  (Id. ¶ 40.)

According to the complaint, the class period began when, less than two weeks later, on April 11, 2007, Genzyme sent "an indication of interest" to Bioenvision's Board that it sought to acquire Bioenvision at a price of $5.25 per share.  (Id. ¶ 41.)  Genzyme also requested access to information for due diligence purposes.  (Id.)  Over the next week, the Bioenvision board discussed the Genzyme offer with management, UBS Securities LLC, and Goodwin Procter LLP (legal counsel to Bioenvision).  (Id. ¶ 44.)  Throughout April, Bioenvision and Genzyme shared confidential information and entered into a confidentiality agreement.  (Id. ¶¶ 45-46.)

Merger plans picked up steam in early May.  On May 1, 2007, the Bioenvision Board created a committee tasked with working with Bioenvision's senior management, UBS, and Goodwin Procter to negotiate with Genzyme.  (Id. ¶ 48.)  On May 2, 2007, Perseus-Soros exercised its fixed-price warrants to purchase three million shares of Bioenvision common stock at a purchase price of $2 per share.  (Id. ¶ 51.)  On May 10, 2007, Genzyme reiterated its $5.25

offer to Bioenvision, and on May 15, 2007, Bioenvision management expressed to BOA an agreement to move forward and, to that end, provided Genzyme with advanced due diligence. (Id. ¶ 61.)

The last steps towards finalizing the merger took place in late May.  As the news of the merger allegedly began to leak into the market, the Bioenvision stock price began to rise from a close of $4.22 on May 22, 2007.  (Id. ¶ 62.)  On May 24, 2007, Genzyme's Board of Directors approved the transaction.  (Id. ¶ 63.)  On May 25, 2007, the parties agreed to proceed with an acquisition at $5.60 per share, or approximately $345 million.  (Id. ¶¶ 64, 66.)  On May 28, 2007, the day the class period ends, the final merger agreement was approved, and on May 29, 2007, it was signed.  (Id. ¶ 64.)  On May 29, 2007, the price of Bioenvision's stock closed at $5.63, and on May 30, 2007, it closed at $5.88 per share.

       C.    The Alleged Fraud

Plaintiffs contend that during the class period, defendants "perpetrated a fraudulent scheme" by making false and misleading statements and "by failing to disclose the plan to sell Bioenvision to Genzyme."   (Id. ¶¶ 89-91, 98-101.)  Defendants' material misstatements and omissions had the effect, plaintiffs claim, of "artificially suppress[ing]" the price of Bioenvision securities during the class period.  (Id. ¶¶ 92-95, 102-05.)  Plaintiffs sold their stock before the merger was officially announced and thus before the resulting sharp increase in the stock price. (Id. ¶¶ 92-95, 102-105.)

According to the complaint, Bioenvision's public filings "touted the focus of its business as the acquisition, development, distribution and marketing of compounds and technologies for the treatment of cancer, autoimmune disease and infection" when, in fact, the company's "primary focus" was "no longer to develop and market cancer treatments, but rather to find a

merger partner and to effectuate a takeover of the Company."  (Id. ¶¶ 25, 70.)  Because they participated in the pre-merger events detailed above, defendants knew the "true facts regarding the Company's strategic objectives and future business prospects" and were "privy to confidential proprietary information."  (Id. ¶ 79.)  Yet defendants' public statements, plaintiffs contend, were in conflict with this material information.  (Id. ¶ 80.)

Plaintiffs allege that defendants knew or recklessly disregarded the false and misleading nature of the statements they disseminated to investors.  (Id. ¶ 82.)  Plaintiffs allege that defendants as a whole engaged in the fraudulent scheme to "purposefully deflate the price of Bioenvision securities" so that Genzyme could acquire Bioenvision quickly and easily for cash. (Id. ¶ 83.)  Relying once again on Luci's state court complaint, plaintiffs allege that Wood and Scibetta participated in the scheme because the controlling shareholders of Bioenvision had threatened to terminate key officers of Bioenvision in advance of the merger in order to avoid having to pay change of control bonuses that would be triggered by the merger.  (Id. ¶ 84 (citing Luci Compl.).)

In support of these allegations, plaintiffs claim, the Bioenvision defendants failed to make adequate disclosures or to correct inadequate disclosures in seven specific filings and press releases: (1) a February 8, 2007 press release (id. ¶¶ 30-32); (2) an April 2, 2007 press release, registration statement, and prospectus supplement (id. ¶¶38-39); (3) a May 1, 2007 press release announcing a quarterly conference call (id. ¶¶ 49-50); (4) a May 7, 2007 press release (id. ¶¶ 52-53); (5) a May 8, 2007 press release (id. ¶¶ 54-56); (6) a May 9, 2007 address to investors and analysts at the UBS Global Generic and Specialty Pharmaceuticals Conference (id. ¶ 57); and (7) a May 9, 2007 Quarterly Report on Form 10-Q, which included the Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") (id. ¶¶ 58-60).

Each of these statements were false and misleading, according to plaintiffs, because they stated that Bioenvision's primary focus was to develop and market cancer treatments when, since January 2007, the company's primary focus actually had become finding a merger partner and effectuating a takeover of the company.  (Id. ¶¶ 69-70.)  With respect to the pre-class period statements, plaintiffs allege that the Bioenvision defendants had a duty to correct or update the statements made prior to May 1, 2007 because those statements were still "'alive' and influencing the price of Bioenvision stock in the market" during the class period.  (Id. ¶ 69.)  As for the statements made on and after April 11, 2007—the start of the class period—the Bioenvision defendants were under a duty to make those statements truthful, complete, and accurate.  (Id.)

Perseus-Soros also allegedly misled the investing public by (1) failing to file an amended Schedule 13D as early as January 2007, once the merger plans were set in motion and (2) breaching its duty to disclose material information or abstain from trading when it exercised warrants on May 2, 2007 to purchase three million shares of Bioenvision stock at $2 per share. (Id. ¶¶ 43, 51.)

Each of these allegations is analyzed in detail below.

## II.   DISCUSSION

### A.   Standard of Review

A complaint will survive a motion to dismiss it pursuant to Rule 12(b)(6) only if the plaintiff has pled "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  Pursuant to this "flexible 'plausibility standard,'" Iqbal v. Hasty, 490 F.3d 143, 157 (2d Cir. 2007), a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level," Twombly, 550 U.S. at 555.  When

deciding a motion to dismiss, the Court assumes the truth of all facts asserted in the complaint and draws all reasonable inferences from those facts in favor of the plaintiffs.  See Shah v. Meeker, 435 F.3d 244, 248 (2d Cir. 2006).  Thus, at this stage of the proceedings, the Court's sole focus is on the sufficiency of the pleadings and not on the weight of the evidence that might be presented at trial.  See Chosun Int'l, Inc. v. Chrisha Creations, Ltd., 413 F.3d 324, 327 (2d Cir. 2005).  However, it is appropriate for the Court to consider "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC . . . ."  Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000) (citing Cosmas v. Hassett, 886 F.2d 8, 13 (2d Cir. 1989); Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991)).

      B.      Claims Against the Bioenvision Defendants

          *1.*      *Legal Standard for Claims Pursuant to Section 10(b) and Rule 10b-5*

Section 10(b) of the Exchange Act forbids the use of "any manipulative or deceptive" practice "in connection with the purchase or sale of any [registered] security . . . ."  15 U.S.C. § 78j(b).  Rule 10b-5, which the Securities and Exchange Commission ("SEC") promulgated pursuant to section 10 of the Exchange Act, states that it is "unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5.

To state a claim pursuant to section 10(b) and Rule 10b-5, a plaintiff must adequately allege the following elements: "(1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred of in cases involving public securities markets (fraud-on-the-market cases) as

'transaction causation;' (5) economic loss; and (6) 'loss causation,' i.e., a causal connection between the material misrepresentation and the loss." Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005) (citations omitted).

Complaints alleging securities fraud also must comply with the heightened pleading requirements of the PSLRA and Fed. R. Civ. P. 9(b), which require that "the circumstances constituting fraud . . . shall be stated with particularity" in the complaint. A "complaint making such allegations must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" Shields v. Citytrust Bancorp., 25 F.3d 1124, 1127-28 (2d Cir. 1994) (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)).

The PSLRA requires a complaint to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b). While the PSLRA "does not require that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based," plaintiffs must "plead with particularity sufficient facts to support those beliefs." Novak v. Kasaks, 216 F.3d 300, 313-14 (2d Cir. 2000). As a result, courts focus "on whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission." Id. at 314 n.1. Securities fraud actions based on an "an unsupported general claim" constitute "bare pleadings" and cannot survive a motion to dismiss. In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 72-73 (2d Cir. 2001); see also San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 812-13 (2d Cir. 1996).

The duty of a corporation and its officers to disclose is limited.  To that end, "a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact.  Rather, an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts."  In re Time Warner Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993) (citing Basic Inc. v. Levinson, 485 U.S. 224, 239 n.17 (1988); Glazer v. Formica Corp., 964 F.2d 149, 157 (2d Cir. 1992)).  There are three circumstances in which a duty to disclose arises: (1) when the SEC's rules require disclosure, see, e.g., Glazer, 964 F.2d at 156-57; (2) when an insider trades on the basis of non-public information, otherwise known as the "disclose or abstain" rule, see, e.g., SEC v. Texas Gulf Sulphur, 401 F.2d 833, 848 (2d Cir. 1968); and (3) "when disclosure is necessary to make prior statements not misleading," whether those statements were true or false at the time they were made, see, e.g., Time Warner, 9 F.3d at 268.

There is no specific duty to disclose merger negotiations under SEC rules until they become definitive agreements.  See Current Report (Form 8-K), Item 1.01 & Instruction 1; see also Chien v. Skystar Bio Pharm. Co., 566 F. Supp. 2d 108, 116-17 (D. Conn. 2008).  If there is no other duty to disclose, silence on the issue of merger discussions is not misleading.  See Basic, 485 U.S. at 239 n.17; In re MCI Worldcom, Inc. Sec. Litig., 93 F. Supp. 2d 276, 280 (E.D.N.Y. 2000).  If a public company elects to speak publicly about mergers or acquisitions, however, it must speak truthfully and completely.  See Time Warner, 9 F.3d at 268; MCI, 93 F. Supp. 2d at 280 (duty to disclose arose only when the company affirmatively denied merger intentions); In re Columbia Sec. Litig., 747 F. Supp. 237, 243 (S.D.N.Y. 1990) (plaintiff sufficiently pled that it was materially misleading for defendants to affirmatively deny merger negotiations while merger negotiations were ongoing).  General statements about a company's

financial projections or activities that do not address the prospects for a merger do not give rise to a duty to disclose a potential merger.  See, e.g., Reiss v. Pan Am. World Airways, Inc., 711 F.2d 11, 13-14 (2d Cir. 1983); Fisher v. SpecTran Corp., No. 99-12359, 2001 WL 34644311, at *3-5 (D. Mass. May 31, 2001); Schlanger v. Four-Phase Sys., Inc., 582 F. Supp. 128, 133 (S.D.N.Y. 1990); see also San Leandro, 75 F.3d at 810-11 (a company's statement about marketing strategy was not rendered misleading by the company's consideration of an alternative marketing strategy, and thus there was no duty to disclose that potential alternative plan).  But see Caremark, Inc. v. Coram Healthcare Corp., 113 F.3d 645, 650 n.7 (7th Cir. 1995).

### 2.    Application to Plaintiff's Allegations

Plaintiffs argue that there was a definitive merger agreement as early as January 2007, and that agreement gave rise to the Bioenvision defendants' duty to disclose.  In making the allegation that Bioenvision and Perseus-Soros entered into a secret agreement, however, plaintiffs cite solely to the Luci complaint in his state employment action.  (See Supp. Am. Compl. ¶¶ 28-29.)  Although plaintiffs arguably can rely on Luci's complaint to the extent that they are citing to Luci's own knowledge, see In re IAC/InterActiveCorp Sec. Litig., 478 F. Supp. 2d 574, 589 (S.D.N.Y. 2007), Luci's central allegation that in January 2007, Genzyme and Perseus-Soros "secretly agreed" to merge is based on an anonymous source (Supp. Am. Compl. ¶ 29 (citing Luci Compl. ¶¶ 18, 45)).  Plaintiffs here state that, according to Luci's complaint, "Luci has been informed" that there was a "secret" January 2007 meeting between Perseus-Soros and Genzyme where the Perseus-Soros directors "determined" to accept Genzyme's offer to acquire Bioenvision.  (Id. ¶¶ 28-29.)  Plaintiffs have not alleged anything at all about Luci's alleged anonymous source, let alone describing him with any particularity whatsoever, and the Court is wholly unable to determine whether this source was in a position to know what he is

13

alleged to have told Luci, or, in fact, whether or not this alleged anonymous source even exists. The Court therefore cannot credit any of these allegations that come from an alleged anonymous source of Luci's, which were adopted wholesale and relied upon by plaintiffs here to make serious charges of fraud.  See Novak, 216 F.3d at 314; In re Sierra Wireless, 482 F. Supp. 2d 365, 376 (S.D.N.Y. 2007).

Without the allegations from an anonymous source in Luci's state court complaint of a definitive merger in January 2007, the complaint does not sufficiently allege a definitive merger agreement prior to the announcement in late May 2007.  There are thus no specific SEC rules that would have required Bioenvision or the individual Bioenvision board members (including defendants Wood, Cooper, Elms, Kauffman, Schiff, and Scibetta) to disclose the merger negotiations, and there are no allegations that Bioenvision insiders traded on the basis of inside information about the merger.  As a result, if the Bioenvision defendants had a duty to disclose information about the merger, it would come from a duty to update or correct statements that the company or the individual defendants had previously made in order to prevent those statements from being misleading, whether those statements had been true at the time they were made or not.  See Time Warner, 9 F.3d at 268.

Based on the allegations in the complaint, however, the Bioenvision defendants' allegedly misleading statements never referred to a merger or the possibility of a merger. Plaintiffs argue that once defendants spoke about the primary focus of Bioenvision and recent events in the company's history, they had a duty to disclose the ongoing negotiations with Genzyme in order to keep those statements about Bioenvision's focus on recent company events from being misleading.  To support that claim, plaintiffs point to statements made by defendants that could be read as touching on the issues of strategic partnerships with Genzyme and thus,

according to plaintiffs, giving rise to an obligation to update or correct those statements.

Nevertheless, plaintiffs have failed to identify any misleading statements with the requisite

particularity.  Accordingly, plaintiffs' claims against the Bioenvision defendants fail because the

statements made by the company and its directors and officers did not give rise to a duty to

disclose the merger discussions.

a.      Bioenvision's February 8, 2007 Press Release

Bioenvision's February 8, 2007 press release announced the company's financial results

for the second quarter of the fiscal year but did not mention the possibility of a merger.  (Id. ¶

30.)  In the press release, Wood stated that Bioenvision "remain[s] focused on continuing to

execute on [its] global development and commercialization strategy for Evoltra in the months

ahead."  (Id. ¶¶ 30, 31.)  Plaintiffs claim that these statements were false and misleading because

the press release failed to disclose that Bioenvision and Perseus-Soros—its controlling

shareholder—were involved in negotiations involving Genzyme's acquisition of Bioenvision.

(Id. ¶ 32.)  Plaintiffs assert that once Bioenvision addressed the company's focus on "continuing

to execute on [its] global development and commercialization strategy" and recent events, the

Bioenvision defendants had a duty to include all material information regarding Bioenvision's

business activities and to describe fully any changes that might occur with respect to

Bioenvision's business, capital structure, or independence.  (Id. ¶ 32.)   Although these

statements were made before the class period began, according to plaintiffs, the Bioenvision

defendants had a duty to correct these statements during the class period.  (Id. ¶ 42.)

Even assuming that the statements here were pled with the requisite particularity for

purposes of Rule 9(b), statements that Bioenvision "remain[s] focused on continuing to execute

on our global development and commercialization strategy for Evoltra in the months ahead"

15

simply do not give rise to a duty to disclose merger negotiations.  The statements in this press

release are clearly distinguishable from those made in the cases relied upon by plaintiffs.  In

Time Warner, unlike here, the company had specifically made statements about strategic

alliances, and thus plaintiffs had adequately pled that the defendants had had a duty to disclose

any facts that would prevent those earlier statements from misleading the public.  9 F.3d at 268.

Similarly, this is not a case where defendants had affirmatively denied merger negotiations, thus

giving rise to a duty to disclose the truth.  See MCI, 93 F. Supp. 2d at 280-81; Columbia, 747 F.

Supp. at 243.  This also is not a case, such as Castellano v. Young & Rubicam, Inc., 257 F.3d

171 (2d Cir. 2001), where the defendant was specifically negotiating strategic alternatives while

falsely assuring the plaintiff that "nothing was going to change in the [company's] near future"

and where the defendant conceded it had a duty to disclose the information at issue.  Id. at 175,

179.

　　　　Here, defendants did not have an independent duty to disclose their merger negotiations,

nor were they making false statements that "nothing was going to change."  Nor is this situation

like that in Weiner v. Quaker Oats Co., 129 F.3d 310 (3d Cir. 1997), where the Third Circuit

reversed the dismissal of a complaint, finding that a factfinder could find that the defendants

should have disclosed some information relating to their imminent merger because a merger

would have directly affected the company's debt-to-equity ratio, in direct contradiction to the

company's numerous promises in public statements that the ratio would not change.  Id. at 318-

19.  Here, plaintiffs point to no similarly specific business objective that would be specifically

affected by a merger.

　　　　The circumstances here bear more resemblance to those in cases such as Basic and

Schlanger, where even if there were a duty to disclose merger negotiations when a company

affirmatively made statements denying negotiations, there would have been no such duty if the statements made by a company did not address merger prospects at all.  See Basic, 485 U.S. at 239 n.17; Schlanger, 582 F. Supp. at 132-34.  For example, in Schlanger, the court would not grant summary judgment because it found that the defendant, which did not disclose its merger negotiations, could have had a duty to disclose those negotiations once the company's Treasurer had responded affirmatively to questions about increased price and trading volume in his company's stock price by saying that he was "not aware of any corporate developments which would affect the market of its stock."  582 F. Supp. at 129.  The court held that the company had a duty to disclose all material facts that would prevent that statement from being misleading, and it was a question of fact as to whether the company violated its duty to disclose the merger negotiations.  Id. at 132-33.  The court noted, however, that the company "could have remained silent, and would not have been required, under Reiss, to issue any public announcement concerning the then inchoate merger negotiations."  Id. at 132 (distinguishing cases where defendants remained silent and thus had no duty to disclose merger negotiations).  What happened in the case before this Court is far more similar to the second scenario than the first. The statements in the February 8 press release do not affirmatively deny that Bioenvision was engaged in merger talks—in fact, the press release never said anything about a merger at all. Thus, as discussed in Schlanger, remaining silent here does not give rise to a duty to disclose merger talks.  See Reiss, 711 F.2d at 13-14; see also San Leandro, 75 F.3d at 810-11.

Under plaintiffs' proposed rule, any public company that publicly described its core business or strategy—which is to say, every public company—would be required to disclose potential or actual merger negotiations.  Statements that do not raise the subject of mergers, even tangentially, cannot impose a duty to disclose all material information concerning merger

discussions.  In fact, the Supreme Court has written that without a duty to disclose, silence is an

appropriate response to questions about merger discussions.  Basic, 485 U.S. at 239 n.17.  Here,

where the company said nothing about the possibility of being acquired, the failure to disclose

discussions concerning a possible merger did not mislead shareholders one way or the other.  See

Reiss, 711 F.2d at 13-14; Schlanger, 582 F. Supp. at 132-33; see also Time Warner, 9 F.3d at

268.

                             b.        Bioenvision's April 2, 2007 Press Release and Prospectus

       Bioenvision's April 2, 2007 press release announced that it had priced its registered

offering of eight million shares of common stock at $3.75 per share.  (Supp. Am. Compl. ¶ 35.)

The sale was effected through a prospectus and a supplemental prospectus issued around March

30, 2007.  (Id. ¶ 35.)  Plaintiffs treat these as one set of "statements," and the Court will as well.

       Plaintiffs do not point to any specifically misleading statements in the press release,

prospectus, or supplemental prospectus; instead, they quote the supplemental prospectus at

substantial length and state that because nothing in those documents mentioned the possibility of

a sale or merger with Genzyme, the documents were materially false and misleading.  (Id. ¶¶ 37-

38.)  Because defendants addressed the company's business, recent developments, the

company's agreement with Genzyme to co-develop the drug Evoltra, the stock price and

volatility, future sales, and dilution and mergers in the abstract, plaintiffs allege, the Bioenvision

defendants had a duty to disclose material information that would describe changes in

Bioenvision's business or capital structure that were under consideration more fully.  (Id. ¶¶ 38-

39.)  Although these statements were made before the class period began, plaintiffs allege that

the Bioenvision defendants were under a duty to correct these statements throughout the class

period.  (Id. ¶ 42.)

Plaintiffs have not pled these allegations with anything remotely approaching the requisite particularity.  Plaintiffs simply paste seven single-spaced pages of a prospectus supplement—parts of which are accidentally pasted in twice—and allege that the Bioenvision defendants should have disclosed merger negotiations because the supplement addressed "the business of the Company, recent developments, its relationships with Genzyme, the stock price and volatility and future [s]ales and dilution and merger."  (Id. ¶ 39.)  These pleadings are insufficient pursuant to Rule 9(b), as they fail to allege which statements were misleading, who made those statements, and precisely how they were misleading.  See Shields, 25 F.3d at 1127-28; San Leandro, 75 F.3d at 812-13.  Plaintiffs therefore have not stated a claim relating to the supplemental prospectus.

         c.        Bioenvision's May 1, 2007 Press Release

Plaintiffs allege that Bioenvision's May 1, 2007 press release was false and misleading because it mentioned the company's goals—"the acquisition, development and marketing of compounds and technologies for the treatment of cancer"—but did not disclose the fact that Bioenvision and its controlling shareholder were at that time allegedly involved in merger discussions.  (Supp. Am. Compl. ¶¶ 49-50.)  Plaintiffs allege that Bioenvision had a duty to disclose those discussions because this press release mentioned the company's "focus."  (Id. ¶ 50.)

These allegations do not set forth sufficient facts to give rise to a duty to disclose merger negotiations.  As with the February 8, 2007 press release, even assuming these false or misleading statements were pled with the requisite particularity, general boilerplate statements about Bioenvision's work do not give rise to a duty to disclose merger negotiations.  See Reiss, 711 F.2d at 13-14; Schlanger, 582 F. Supp. at 133.  Bioenvision's statements that its "primary

focus is the acquisition, development and marketing of compounds and technologies for the treatment of cancer" (id. ¶ 49) were not rendered false or misleading by the fact that Bioenvision also allegedly was discussing a merger with Genzyme, and Bioenvision was under no duty to disclose merger negotiations in the May 1, 2007 press release. See Basic, 485 U.S. at 239 n.17.

d.      Bioenvision's May 7, 2007 Press Release

Plaintiffs further claim that six days later—on May 7, 2007—Bioenvision issued a press release that contained additional false and misleading statements and omissions. (Id. ¶¶ 52-53.) This press release related to the exercise of $7.4 million in warrants; Wood described the warrant exercise as "a vote of confidence in the Company's execution capabilities and substantial future prospects." (Id. ¶ 52.) According to the allegations in the amended complaint, however, six million dollars worth of these warrants were exercised by Perseus-Soros, which had inside information about the upcoming merger with Genzyme. (Id. ¶ 51.) Plaintiffs claim that this press release was false and misleading because it failed to disclose the discussions and negotiations surrounding the potential merger. (Id. ¶ 53.)

Not only do plaintiffs not allege which statements were misleading or who had made those statements, but they do not explain in what way the May 7, 2007 press release was misleading. In no way do plaintiffs' allegations concerning the May 7, 2007 press release give rise to a duty to disclose the allegedly ongoing merger discussions. See Shields, 25 F.3d at 1127-28; San Leandro, 75 F.3d at 812-13.

e.      Bioenvision's May 8, 2007 Press Release

Plaintiffs cite portions of Bioenvision's May 8, 2007 press release, which reported Bioenvision's financial results for the quarter ending March 31, 2007, and which quoted Scibetta and Wood discussing the company's research. (Id. ¶¶ 54-55.) The press release also referred to

the company's "primary focus" as working on methods for treating cancer.  (Id. ¶ 55.)  These statements are allegedly false and misleading because Bioenvision did not disclose that merger discussions were underway.  (Id. ¶ 56.)  Plaintiffs claim that defendants had a duty to disclose those discussions to provide a complete disclosure of all material information once defendants issued statements on the subject of Bioenvision's financial objectives.  (Id.)  According to plaintiffs, defendants should have disclosed at least the discussions among Bioenvision, Perseus-Soros, and Genzyme about the relative values of Bioenvision and Genzyme; the form that the combined companies would take, including proposed leadership; and the price Genzyme would pay for Bioenvision's shares.  (Id.)

   First, the pleadings do not satisfy the particularity requirement of Rule 9(b), as they do not "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  Shields, 25 F.3d at 1128 (quotation and citation omitted).  It is insufficient to paste a press release into a complaint without explaining with particularity why any particular statements are "false and misleading."  See Scholastic Corp., 252 F.3d at 76; see also San Leandro, 75 F.3d at 812-13 (plaintiffs failed to allege with particularity how a change in marketing strategy rendered the company's prior statements about its marketing strategy false).  Second, even if the false and misleading statements were pled with particularity, there is no mention of mergers in this press release, and thus the general nature of the statements in the press release, such as those referring to the company's "primary focus," do not give rise to a duty to disclose potential merger negotiations.  See Reiss, 711 F.2d at 13-14; Schlanger, 582 F. Supp. at 133; see also Basic, 485 U.S. at 239 n.17.

        f.        Bioenvision's May 9, 2007 Address to Investors and Analysts

Plaintiffs allege that in an address to investors and analysts on May 9, 2007 at the UBS Global Generic and Specialty Pharmaceuticals Conference in New York City, Bioenvision failed to make any disclosures about the company's progress toward an acquisition by Genzyme. (Id. ¶ 57.)  Plaintiffs assert that this presentation was therefore materially false and misleading. (Id.)

These allegations do not satisfy the particularity requirements of Rule 9(b).  Plaintiffs point to no specific statements whatsoever, let alone who made the statements.  Instead, plaintiffs allege only that "the Company participated in the [conference] . . . and addressed investors and analysts."  (Id. ¶ 57.)  In addition, as set forth above, there was no duty at that time to disclose any potential merger discussions.  Thus, the allegation concerning the May 9 address are wholly insufficient to state a claim for securities fraud.  See Shields, 25 F.3d at 1127-28.

        g.        Bioenvision's May 9, 2007 Form 10-Q

On May 9, 2007, Bioenvision released its Quarterly Report on Form 10-Q for the period ending March 30, 2007, including the MD&A.  (Supp. Am. Compl. ¶ 58.)  Plaintiffs allege that defendants' failure to update the "subsequent events" section of the MD&A with facts about progress toward a merger with Genzyme rendered the MD&A false and misleading.  (Id. ¶¶ 58-60.)

Although the long section of the MD&A excerpted by plaintiffs does mention Bioenvision's work with Genzyme, plaintiffs never point to specific statements, never allege why those statements were misleading, and never allege who actually made those statements.  Thus plaintiff's allegations—that the MD&A was misleading and that the defendants had a duty to correct or update it with information about the merger negotiations with Genzyme—have not

been pled with the requisite particularity and do not give rise to a duty to disclose merger

negotiations.  See Shields, 25 F.3d at 1127-28; San Leandro, 75 F.3d at 812-13.

* * *

Accordingly, the Bioenvision defendants' motion to dismiss is granted.

C.      Claims Against Perseus-Soros

          1.      *The Duty to Disclose Pursuant to Section 13(d) and Perseus-Soros's*
                *Alleged Secret Agreement to Change Control of Bioenvision*

                a.      Legal Standard

There is no private right of action under section 13(d) of the Exchange Act, but a plaintiff

can point to a violation of section 13(d) as the predicate for a 10b-5 claim.  See GAF Corp. v.

Millstein, 453 F.2d 709, 720 n.22 (2d Cir. 1971).  A beneficial owner of more than five percent

of a class of a company's stock must file a Schedule 13D to meet the disclosure requirements of

section 13(d).  15 U.S.C. § 78m(d); 17 C.F.R. § 240.13d-101.  A Schedule 13D

> requires the filer to (1) state the purpose of the acquisition of the covered
> securities, including any purpose to acquire control and (2) certain specifically
> listed "plans or proposals" which relate to or would result in (a) the acquisition or
> disposition of additional shares; (b) any change in the board of directors or
> management; or (c) any material change in the business or corporate structure of
> the issuer.

Rosen v. Brookhaven Capital Mgmt. Co., Ltd., 113 F. Supp. 2d 615, 630 (S.D.N.Y. 2000) (citing

17 C.F.R. § 240.13d-101).  A beneficial owner must amend an already-filed 13D if there are any

material changes in the purpose of its ownership of more than five percent of the company's

stock.  17 C.F.R. § 240.13d-2(a).  As with any alleged 10b-5 violation, the touchstone is the

existence of a duty to disclose.  Azurite Corp. Ltd. v. Amster & Co., 52 F.3d 15, 18 (2d Cir.

1995).  There is a duty to disclose if the shareholder had a purpose of acquiring control and had

the requisite intent, defined as "a determination [to acquire control] made with an element of resolve."  Id.

Furthermore, a "plan" for purposes of section 13(d) must be "something more definite than vaguely formed thoughts for the future."  Id.  Premature disclosures would run counter to the aims of section 13(d), as "[i]t would be as serious an infringement of these regulations to overstate the definiteness of the plans as to understate them."  Elec. Specialty Co. v. Int'l Controls Corp., 409 F.2d 937, 948 (2d Cir. 1969).  "Thus, unless a course of action is decided upon or intended, it need not be disclosed as a plan or proposal."  Azurite, 52 F. 3d at 18. "[P]reliminary and tentative" discussions are not the kind of agreement that must be disclosed. Todd Shipyards Corp. v. Madison Fund, Inc., 547 F. Supp. 1383, 1389 (S.D.N.Y. 1982); see also Transcon Lines v. A.G. Becker, Inc., 470 F. Supp. 356, 376-77 (S.D.N.Y. 1979) (defendants need not disclose plans to acquire control of a company or to make changes to the company's management, business, or structure unless those plans were "firm").

A complaint need not plead, however, every term of a 13D filer's plan or purpose to allege control.  This is because a "Schedule 13D must disclose a purpose to acquire control, even though this intention has not taken shape as a fixed plan."  E.ON AG v. Acciona, S.A., No. 06 Civ. 8720, 2007 WL 316874, at *8 (S.D.N.Y. Feb. 5, 2007) (quotation and citation omitted). Even if a 13D filer "does not know if, when, or how . . . [influence or control] might be achieved," it is not relieved of its duty to file a Schedule 13D, especially if its Schedule 13D denied that it had any plans or proposals for "any extraordinary corporate transaction" for the company.  Id. at *11 (quotations and citation omitted); see also Todd Shipyards Corp., 547 F. Supp. at 1387.  In such a case, the Schedule 13D filer has a duty to correct its filing.  E.ON AG, 2007 WL 316874, at *11.  Furthermore, at the motion to dismiss stage, courts may find that

"purpose and intent may not be divined without some investigation and discovery."  Rosen, 113

F. Supp. 2d at 632.

b.      Application to Plaintiffs' Claims

Perseus-Soros filed a Schedule 13D/A in December 2004 and did not update it until after

the merger between Bioenvision and Genzyme had been announced.  Plaintiffs claim that

Perseus-Soros had a duty to amend its Schedule 13D at some earlier point, potentially as early as

January 2007, because it allegedly had entered into a secret agreement with Genzyme to allow it

to acquire Bioenvision.  (Supp. Am. Compl. ¶ 43.)  Specifically, Perseus-Soros allegedly was

required to update its filing throughout the class period because there was a material change to

"contracts, arrangements, understandings or relationships" with the company after this secret

agreement was formed.  (Id.)  Perseus-Soros never amended its Schedule 13D before the merger

announcement, however, and plaintiffs claim that because Perseus-Soros had a continuing duty

to correct the Schedule 13D, that filing was rendered false and misleading throughout the class

period.  (Id.)

Plaintiffs' claims are insufficient because they improperly rely upon an anonymous

source for the key allegation that an undefined secret agreement was formed between Perseus-

Soros and Bioenvision.  The other allegations in their amended complaint cannot, on their own,

state a claim that defendants violated a duty to disclose a "plan[] or proposal[]" that would result

in a change of control of Bioenvision.  17 C.F.R. § 240.13d-101.

In setting out a claim against Perseus-Soros, plaintiffs allege that Collier, an Executive

Vice President of Genzyme, met with Purcell, a Senior Managing Director of Aisling Capital, an

investment manager for Perseus-Soros, to discuss Genzyme's possible interest in acquiring

Bioenvision in January 2007.  (Supp. Am. Compl. ¶ 28.)  Purcell told Collier that "it may be an

appropriate time to discuss an acquisition of [Bioenvision] and that Genzyme should take the matter up directly with the Company."  (Id.)  Plaintiffs also allege that in January 2007, Perseus-Soros and its directors on the Bioenvision board entered into a secret agreement with Genzyme; they rely on Luci's complaint in Luci's state action, which, in turn, relied on an unnamed source for its allegations of a secret agreement.  (Id. ¶¶ 28-29.)  Plaintiffs cite Luci's complaint and allege that at a January 2007 meeting, the Perseus-Soros-connected directors on the Bioenvision board—Elms, Schiff, Cooper, and Kaufman—"determined to accept [a tender] offer from Genzyme to acquire Bioenvision."  (Id. ¶¶ 28-29.)  Plaintiffs allege that, again according to Luci's state court complaint, in March 2007, the Perseus-Soros-connected directors were in constant contact with Scibetta, and they "insisted" at a secret board meeting that Bioenvision management agree to sell their shares of Bioenvision stock to Genzyme.  (Id. ¶ 34(b)-(c).)

In connection with plaintiffs' scienter allegations, they allege that Perseus-Soros and its representatives on Bioenvision's board had a "unique financial motive to conceal and misrepresent information regarding a merger between Bioenvision and Genzyme in that Genzyme was the only prospective buyer for Bioenvision because of its marketing co-venture with Bioenvision."  (Id. ¶ 81.)  Plaintiffs allege that Persues-Soros had a large illiquid stake in Bioenvision that it could not "profitably monetize" unless Genzyme acquired Bioenvision.  (Id.)  Furthermore, Perseus-Soros, like all of the defendants, "engaged in such scheme to purposefully deflate the price of Bioenvision securities in order to, among other things, ensure that Genzyme could quickly acquire Bioenvision for cash."  (Id. ¶ 83.)

In determining whether plaintiffs have set forth a valid claim for a violation of section 13(d), the threshold issue is whether plaintiffs can rely almost exclusively on Luci's complaint in his lawsuit against Bioenvision to satisfy the pleading requirements of Rule 9(b) and the PSLRA.

Plaintiffs arguably can rely on Luci's complaint to the extent that they are citing to Luci's own knowledge.  See In re IAC/InterActiveCorp Sec. Litig., 478 F. Supp. 2d 574, 589 (S.D.N.Y. 2007) ("Courts in this district require plaintiffs to sufficiently identify the sources of their information and belief so as to allow each defendant and the Court to review the sources and determine, at the pleading stage, whether an inference of fraud may be fairly drawn from the information contained therein." (quotation and citations omitted)).  Luci was at one time an officer of Bioenvision.  (Luci Compl. ¶ 11.)  Luci's central allegation that in January 2007, Genzyme and Perseus-Soros "secretly agreed" to merge is set forth by Luci—not even plaintiffs here—on the basis of an anonymous source.  (Supp. Am. Compl. ¶ 29 (citing Luci Compl. ¶¶ 18, 45).)  Plaintiffs state only that, according to Luci's complaint, "Luci has been informed" about the central element of this complaint, i.e., that there was a "secret" January 2007 meeting between Perseus-Soros and Genzyme where the Perseus-Soros directors "determined" to accept Genzyme's offer to acquire Bioenvision.  (Id. ¶¶ 28-29.)  As noted above, plaintiffs have not alleged anything at all about Luci's alleged anonymous source, let alone describing him with any particularity whatsoever, and the Court is unable to determine whether this source was in a position to know what he is alleged to have told Luci, or, in fact, whether or not this alleged anonymous source even exists.  The Court therefore cannot credit any of these allegations that come from an alleged anonymous source of Luci's, which were adopted wholesale and relied upon by plaintiffs here to make serious charges of fraud.  See Novak, 216 F.3d at 314; In re Sierra Wireless, 482 F. Supp. 2d at 376.

Without the unreliable allegation that Perseus-Soros formed a plan to change control of Bioenvision with Genzyme in January 2007, the remaining allegations are insufficient to set forth a claim that Perseus-Soros has violated section 13(d) by failing to disclose such a plan.

With respect to the alleged meeting in January 2007 between Collier and Purcell discussing Genzyme's possible interest in acquiring Bioenvision, Purcell told Collier that "it may be an appropriate time to discuss an acquisition of [Bioenvision] and that Genzyme should take the matter up directly with the Company."  (Supp. Am. Compl. ¶ 28.)  That allegation does not set forth an adequately definitive plan or purpose on Perseus-Soros's part to change control of Bioenvision.  See Azurite, 52 F. 3d at 18.  Instead of alleging that a plan was formed, the allegation instead is that Purcell, who worked for a company that managed investments for Perseus-Soros, told Collier that Genzyme should speak directly to Bioenvision about a possible merger.  On numerous previous occasions, Bioenvision and Genzyme had discussed the possibility of a merger, and those talks had fallen through.  (See id. ¶ 26.)  This allegation therefore says nothing more than that Purcell thought that another attempt at a merger with Genzyme might be a good idea for Bioenvision at that point in time.  That discussion was, at best, "preliminary and tentative," and certainly does not evince a definitive plan on Perseus-Soros's part to work for a change of control of the company.  See Todd Shipyards Corp, 547 F. Supp. at 1389.

Plaintiffs also allege that, according to Luci, Wood believed that in March 2007, the Bioenvision board members with Perseus-Soros connections were in constant contact with Scibetta.  (Supp. Am. Compl. ¶ 34(b).)   Scibetta was the CFO of Bioenvision, and the fact that he may have been in constant contact with Bioenvision board members is neither unusual nor inappropriate—board members of a public company may speak with officers of the company about any number of topics pertaining to that company's business.  That claim does not "raise a right to relief above the speculative level," Twombly, 550 U.S. at 555, and thus cannot support the allegation that Perseus-Soros had reached a plan or purpose to change control of Bioenvision.

Also according to the amended complaint, the Perseus-Soros-connected board members "insisted" at a secret board meeting that Bioenvision management agree to sell their shares of Bioenvision stock to Genzyme.  (Id. ¶ 34(c).)  This allegation does lend itself more than the others to the possibility that the Perseus-Soros-connected board members had decided upon a plan to change control of Bioenvision.  Nevertheless, that allegation alone is insufficient.

First, it is not clear whether the Perseus-Soros-connected director defendants spoke for Perseus-Soros when they "insisted" that the other Bioenvision board members sell their shares to Genzyme.  Indeed, none of the Bioenvision director defendants with alleged connections to Perseus-Soros actually worked for Perseus-Soros.  Plaintiffs imply that Perseus-Soros controlled the Bioenvision board through these directors (Supp. Am. Compl. ¶ 9), but they never allege how that happened.  It also is not alleged that those directors were even in a position to file or to cause to have filed an updated Schedule 13D by Perseus-Soros.  If the Perseus-Soros-connected directors did not speak for Perseus-Soros, then their actions seemingly cannot be attributed to Perseus-Soros for purposes of determining whether it had entered into a plan to change control of Bioenvision.  Nevertheless, the Court will assume that as alleged nominees of Perseus-Soros, those directors did speak on behalf of the company.  See TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 452 (1976) (noting that disclosure in proxy statement that a company's directors were nominees of another company was part of the evidence that "clearly revealed" the relationship between the two companies).

Even if the Court assumes that the Perseus-Soros-connected director defendants were controlled by Perseus-Soros, the allegation that they wanted other Bioenvision board members to sell their shares to Genzyme is insufficient to state a claim for a violation of section 13(d).  This allegation does not set forth the contours of any plan.  Although a plan need not be fully

determined to be disclosed in a Schedule 13D, Todd Shipyards Corp., 547 F. Supp. at 1387; see also E.ON AG, 2007 WL 316874, at *8, enough details of the plan must be alleged for the Court to determine whether the Schedule 13D filer had formed the "requisite intent"—"a determination [to acquire control] made with an element of resolve"—required by the Second Circuit. See Azurite, 52 F.3d at 18; see also Shields, 25 F.3d at 1127-28 (setting forth heightened pleading requirements pursuant to PSLRA and Rule 9(b)); Feasby v. Industri-Matematik Int'l Corp., No. 99 Civ. 8761, 2000 WL 977673, at *5-6 (S.D.N.Y. July 17, 2000). Plaintiffs cite cases in which courts have found the "requisite intent" to change or acquire control, but these cases involve dissimilar factual situations.

In E.ON AG, for example, the court found that a company, Acconia, S.A., had filed a 13D that was "abysmally inaccurate and inadequate," including a failure to disclose either its arrangements with another company, Banco Santander Central Hispano, S.A., to obtain outstanding shares in a third company, Endesa, S.A., or its intentions with respect to a tender offer battle for Endesa. 2007 WL 316874, at *3, *9. In that case, Acciona admitted that its statements in the original Schedule 13D that it filed were inaccurate. Id. at *4. The court also had denied Acciona's motion to dismiss section 13(d) claims because the plaintiff had a "substantial likelihood of proving that Acciona's Schedule 13D contained false statements and omissions" about Acciona's characterization of its agreements with Santander and its intentions in acquiring Endesa securities. Id. at *5. No similar allegations of an actual agreement to change control are present in this case, and plaintiffs' other cases are also inapposite. See, e.g., Rosen, 113 F. Supp. at 631-32 (finding discovery appropriate because the court was unable to determine the subjective intent of a particular defendant who was allegedly part of a group that planned to change control of a corporation); S.E.C. v. First City Fin. Corp., Ltd., 688 F. Supp.

705 (D.D.C. 1988) (discussing allegations that the defendant had its broker, Bear Stearns,

purchase stock in a company on the defendant's behalf to avoid reporting requirements).

Although there are no further allegations that Perseus-Soros entered into a plan or had the

purpose of changing control of Genzyme, plaintiffs do correctly note that in many of the cases

cited by Perseus-Soros, the courts reached a decision as to the validity of claims alleging

violations of 13(d) at the summary judgment or trial stage, after discovery had taken place.  See

Azurite, 52 F.3d at 18 (summary judgment ); Elec. Specialty Co., 409 F.2d at 948 (summary

judgment); S.E.C. v. Amster & Co., 762 F. Supp. 604, 614 (S.D.N.Y. 1991) (summary

judgment); Todd Shipyards, 547 F. Supp. at 1388-89 (trial); Raybestos-Manhattan, Inc. v. Hi-

Shear Indus., Inc., 503 F.Supp. 1122, 1130 (E.D.N.Y. 1980) (preliminary injunction hearing);

Transcon, 470 F. Supp. at 376 (trial).  Plaintiffs argue that the Court here should look to Rosen,

which denied a motion to dismiss a complaint alleging a violation of 13(d) in favor of allowing

discovery so that the beneficial owner's "purpose and intent" could be determined.  113 F. Supp.

2d at 632.

The fact remains, however, that plaintiffs have pled allegations of a Perseus-Soros plan or

purpose to change control of Bioenvision inadequately.  Without a specific allegation that

Perseus-Soros entered into a defined agreement with Genzyme to change control of Bioenvision

in January 2007, plaintiffs have alleged little more than that individuals on the Bioenvision board

who may have been controlled by Perseus-Soros encouraged the other directors to take a step

that could lead to a merger with Genzyme.  That is not an allegation of a sufficiently definite

plan or purpose to change control of Bioenvision for purposes of section 13(d).  See Transcon,

470 F.Supp. at 376-79.  Plaintiffs' claims are therefore insufficient, either individually or

together, to set out a claim that Perseus-Soros violated 13(d).  See Azurite, 52 F.3d at 18; see

also <u>Elec. Specialty Co.</u>, 409 F.2d at 948 ("It would be as serious an infringement of these regulations to overstate the definiteness of the plans as to understate them.").

Because plaintiffs have not, at this point, set forth adequate allegations that Perseus-Soros had a plan or purpose to change control of Bioenvision, the Court need not reach defendants' other arguments, such as that plaintiffs' scienter allegations are insufficient.  Plaintiffs' claims are dismissed without prejudice.  <u>See</u> Fed. R. Civ. P. 15(a); <u>see also</u> <u>Chill v. Gen. Elec. Co.</u>, 101 F.3d 263, 271 (2d Cir. 1996).

### 2.  *Perseus-Soros's May 2, 2007 Exercise of Warrants*

Finally, plaintiffs allege that, while under a duty to either disclose material inside information or abstain from trading, Perseus-Soros exercised its warrants to purchase three million shares of Bioenvision stock at a purchase price of $2 per share.  (Supp. Am. Compl. ¶ 51.)  Perseus-Soros had no duty to disclose information about the merger or abstain from trading, however, because it was exercising fixed-price warrants.

### a.  Legal Standard

A disclosure duty can arise in certain circumstances when an insider exercises warrants. <u>See</u> <u>Schaffer ex rel. Lasersight Inc. v. CC Investments, LDC</u>, 280 F. Supp. 2d 128, 134-35 (S.D.N.Y. 2003) (exercise of warrants without a fixed price may generate liability).  Exercising warrants does not give rise to a disclosure duty if the warrants have a fixed price, "because the insider by then is already bound by the terms of the option" and "the potential for abuse of inside information is minimal."  <u>See</u> <u>Magma Power Co. v. Dow Chem. Co.</u>, 136 F.3d 316, 322 (2d Cir. 1998).  Indeed, the Second Circuit has explained that "the exercise of a fixed-price option [is]

nothing more than a change from an indirect form of beneficial ownership of the underlying securities to a more direct one," and it is thus a "non-event" for the SEC's purposes.  Id.[2]

b.     Application to Plaintiffs' Claims

Plaintiffs allege that Perseus-Soros had a disclosure duty arising out of its exercise of warrants on May 2, 2007.  (Supp. Am. Compl. ¶ 51.)  The exercise price of those warrants was set in 2001 at $2.00 per share, however, and thus their exercise does not give rise to a duty to disclose merger discussions or insider trading liability.  See Magma, 136 F.3d at 322. Furthermore, Perseus-Soros was not buying from or selling shares to parties who did not have the same information it had.  Instead, it was acquiring shares from Bioenvision, which, according to the allegations in the complaint, had the same knowledge as Perseus-Soros.  Thus, the exercise of fixed-price warrants here did not require Perseus-Soros to disclose merger discussions on its Schedule 13D.  See id.; see also Roth, 2006 WL 2129331, at *10.

D.     Section 20(a) Claims

In addition to their section 10(b) and Rule 10b-5 claims, plaintiffs also allege control person liability against the Bioenvision Officers and Perseus-Soros pursuant to section 20(a) of the Exchange Act.  Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

---

[2] Transactions between issuers and officers and directors are also exempted from some disclosure requirements because there is little "risk that any profit obtained is . . . at the expense of uniformed shareholders and other market participants."  Roth ex rel. Beacon Power Corp. v. Perseus, L.L.C., No. 05 Civ. 10466, 2006 WL 2129331, at *10 (S.D.N.Y. July 31, 2006) (quotation and citation omitted), aff'd, 522 F.3d 242 (2d Cir. 2008); see also 17 C.F.R. § 240.16b-3.

15 U.S.C. § 78t(a).  In order to establish control person liability, a plaintiff "must show a primary violation by the controlled person and control of the primary violator by the targeted defendant." SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996).

As discussed above, plaintiffs have not alleged adequately that the "controlled person"— in this case Bioenvision—has violated the Exchange Act.  Thus, plaintiffs cannot state a claim for control person liability against the individual defendants or Perseus-Soros, and plaintiffs' claims brought pursuant to section 20(a) of the Exchange Act are dismissed.

      E.     Compliance with Rule 11(b)

Pursuant to its statutory obligation, this Court finds that the parties and counsel in this matter have complied with Rule 11(b).  See 15 U.S.C. § 78u-4(c)(1); Rombach v. Chang, 355 F.3d 164, 178 (2d Cir. 2004) ("The PSLRA mandates that, at the end of any private securities action, the district court must 'include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b).'" (quoting 15 U.S.C. § 78u-4(c)(1))).

## III.   CONCLUSION

Plaintiffs either have not alleged a duty to disclose the merger discussions or have failed to set forth their securities fraud claims with the requisite level of particularity.  Plaintiffs therefore have failed to state a claim upon which relief can be granted.  The Bioenvision defendants' motion to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is granted without prejudice.  Perseus-Soros's motion to dismiss is also granted

without prejudice. If plaintiffs intend to submit a second supplemental amended complaint, they

shall do so within 14 days of the entry of this Opinion and Order.

Dated: New York, New York
       March 31, 2009

SO ORDERED:

Sidney H. Stein, U.S.D.J.

35